**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISON**

| | |
|---|---|
| Harry Halstead, | Civil Action No. 4:18-cv-03540-MGL |
| Plaintiff, | |
| vs. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| United States of America, | |
| Defendant. | |

Plaintiff Harry Halstead ("Halstead") brings this negligence action against the United States of America ("the government") pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C. §§ 1346, 2671-2680. Halstead is suing the government for personal injuries and other damages he sustained as a result of a motor vehicle collision with a United States Postal Service ("USPS") employee on September 12, 2015. The Court held a bench trial December 6-10, 2021.[1] After hearing the testimony, assessing the credibility of witnesses, and carefully reviewing the joint exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings of fact and conclusions of law, the Court now makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). To the extent any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## INTRODUCTION

This case arises out of a tragic accident between a USPS employee and three motorcyclists, Halstead, Roy Joffrion ("Joffrion") and Jerry Jackson ("Jackson"), on September 12, 2015, near

---

[1] This case was consolidated for trial with the case of *Roy Joffrion v. United States of America*, 4:18-cv-03548-MGL, which arose out of the same accident on September 12, 2015.

Conway, South Carolina ("Conway").  As Halstead and nine of his friends were traveling home to North Carolina on U.S. Highway 701 in Horry County, South Carolina ("Horry County"), Carolyn Cole ("Cole"), a rural mail carrier for the USPS, entered the northbound travel lane from a private driveway in her Saturn Ion.  When she did, Halstead and Joffrion collided with Cole's car and were ejected from their motorcycles.  Jackson, who was riding behind them, did not collide with Cole's car, but was also ejected from his motorcycle and died at the scene.

## PROCEDURAL HISTORY

Halstead filed this lawsuit against the government on December 20, 2018. (ECF 1)  Throughout the pendency of this case, the only semi-dispositive motion filed was Halstead's motion for partial summary judgment on September 8, 2021. (ECF 74)  The basis for the motion was that the government should be collaterally estopped from contesting liability for the accident based on the Court's prior ruling in the case of *Kimberly L. Jackson, Administratrix of the Estate of Jerry D. Jackson, Jr. v. United States of America*, C/A No. 4:16-3219-RBH, 2018 WL 1755503 (D.S.C. Apr. 12, 2018).[2]  Halstead's motion was rendered moot when the government stipulated to liability on November 16, 2021. (ECF No. 84)

On November 4, 2021, Halstead filed a motion to exclude two of the government's expert witnesses, Sharon Reavis ("Reavis") and Tricia Yount ("Yount"), on the basis of untimely production of their expert reports.  Pursuant to the Court's Sixth Amended Scheduling Order, the government's expert disclosure deadline was January 8, 2021, and this deadline required that experts' written reports be produced at the time the experts were identified.  Although the government timely identified Reavis and Yount, it failed to produce reports from these experts

---

[2] *Jackson* arose out of the same accident and concerned the wrongful death of Jackson.  This Court issued its Order in *Jackson* on April 12, 2018.

until November 12, 2021. Accordingly, Halstead filed a motion to preclude the government from using either of these witnesses at trial. Prior to the start of trial on December 6, 2021, Halstead withdrew his motion as to Reavis and Yount.

## I.    EVIDENCE AT TRIAL / FINDINGS OF FACT

### A.    Background

1.    Halstead resides in Newton Grove, North Carolina. (Tr. 25:11-15) He and his wife Carol Halstead ("Mrs. Halstead") have been married for 14 years. (Tr. 25:18-26:2) They share three children and four grandchildren together. (Tr. 26:3-19) Halstead is 66 years old. (Tr. 117:19-24)

2.    Halstead is a 20-year veteran of the United States Air Force. (Tr. 29:10-14) He served from 1974 to 1994 as pharmacy technician. (Tr. 29:15-18, 31:18) He retired as an E-7 master sergeant. (Tr. 32:1-4)

3.    Following his time in the Air Force, Halstead worked multiple jobs in the private sector primarily involving medical software design and sales. (Tr. 32:5-33:22) In 2012, he went to work for Harnett Health at Betsy Johnson Hospital in Dunn, North Carolina, as a clinical analyst. (Tr. 34:15-17, 27:10)

4.    Halstead has been riding motorcycles since childhood and was an avid motorcyclist prior to the accident. (Tr. 34:24-37:11, 159:15-23)

### B.    The Accident

5.    The accident at issue occurred on September 12, 2015, near Conway. (Tr. 37:24-38:2, 40:10-12) In the preceding days, Halstead, along with 10 of his friends who had gathered together for their annual 9/11 memorial ride, had been in Charleston, South Carolina ("Charleston") relaxing and sightseeing for a few days. (Tr. 38:3-15, 39:18-40:9)

6.     Halstead and his friends departed Charleston on September 12, 2015, to return home to North Carolina. (Tr. 40:10-12)  Along the way, the group stopped in Georgetown, South Carolina ("Georgetown") for lunch. (Tr. 40:13-15)  Afterwards they picked up Highway 701 North in Georgetown and began traveling towards Conway. (Tr. 41:18-22)  The riders were traveling in a staggered formation at approximately 55 m.p.h. with Halstead positioned on the inside line. (Tr. 42:8-22, 43:13-17) Eventually, Halstead observed Cole's car in a driveway off to his right moving towards Highway 701. (Tr. 42:10-15)  Three riders in the group who were ahead of Halstead traveled passed the driveway uneventfully, but as Halstead neared the driveway, he realized Cole's car was not going to stop. (Tr. 42:13-24)  Halstead had nowhere to go when Cole's car entered the roadway. (Tr. 43:1-2)  He tried to veer left to avoid a collision but was unable to do so. (Tr. 43:18-21)

7.     Halstead's motorcycle, a 2001 Harley Davidson Road Glide, collided with the front left portion of Cole's car as it entered the northbound lane of Highway 701. (Tr. 40:16-20, 42:20-43:12)  He was ejected from his motorcycle upon impact, and his body flew over the hood of Cole's car. (Tr. 42:20-43:12, 43:25-44:1, 66:4-8)  Halstead testified he prayed "God, please don't take me now" while he was airborne. (Tr. 42:20-42:12)  He eventually landed on his back in the roadway, and his body tumbled and rolled before eventually coming to rest. (Tr. 44:3-10)

8.     Halstead was wearing a rainsuit, jeans, steel-toed boots, and a helmet with a full face shield when the accident occurred. (Tr. 41:8-17, 160:3-5)  His helmet, which was new, became scratched and scuffed along the top, back, and left side as a result of the crash. (Tr. 47:17-48:21; EX. 1) Halstead lost consciousness for a period of time after landing in the roadway. (Tr. 44:25-45:2)

9.     Chest pain and difficulty breathing was Halstead's immediate concern at the scene, which he attributed to the dislodged grille of Cole's car becoming "embedded" in his chest when he

landed on the ground. (Tr. 44:14-18, 50:3-8)  His mouth was also bleeding from broken teeth, and

his nose was broken. (Tr. 44:18-20)  He also had abrasions and lacerations on his hands, left elbow,

and portions of his back, and his right hip was hurting. (Tr. 44:20-24, 83:9-13)  Halstead was

informed of Jackson's death when he was in the ambulance on the way to the hospital following

the collision. (Tr. 45:20-46:9)

10.     At trial, Halstead described in detail the significant damage the collision caused to his

motorcycle and Cole's car as shown by various photographs taken at the accident scene. (Tr. 45:3-

16, 46:10-19, 49:23-50:13; EX. 2)

## C. Medical Treatment & Witness Testimony

11.     Halstead was transported from the accident scene by ambulance to the emergency

department at Grand Strand Regional Medical Center ("GSRMC"). (Tr. 48:22-49:1; EX. 13)  He

described his body as "riveting in pain" upon arrival. (Tr. 49:2-11)  He continued to have pain in

his mouth and around his nose, as well as his lips and his chin.  (Tr. 49:2-11)  His right hip was in

extreme pain and he hurt in both knees and feet. (Tr. 49:2-11)  His boots had to be cut off his feet.

(Tr. 49:2-11, 66:2-8)  He began having pain in the base of his neck as well. (Tr. 49:19-22).

Halstead was admitted to the hospital and remained there overnight. (Tr. 50:14-15)

12.     Dr. Andrea Romano ("Dr. Romano") is the trauma surgeon who treated Halstead at

GSRMC, and her testimony was presented by video deposition.  According to Dr. Romano,

Halstead was admitted to the emergency department as a level 2 trauma patient, and his admitting

diagnoses included a closed head injury, left chest wall contusion, right buttock/hip contusion,

right ankle contusion, multiple abrasions, 3cm mandible laceration, 1cm lip laceration, and acute

pain due to trauma. (Romano Depo. 19:11-20:2; EX 11: Grand Strand RMC 00039)  Dr. Romano

testified Halstead underwent numerous imaging studies upon his admission, including x-rays of

his chest, pelvis, right hand and right ankle, and computerized tomography ("CT") scans of his head, maxillofacial area, chest, abdomen, and pelvis. (Romano Depo. 18:1-11)  A CT scan was also performed to Halstead's cervical spine due to his complaints of pain in the area.  (Romano Depo. 40:17-24; EX 11: Grand Strand RMC 00089)  The neck CT scan indicated "moderate mid to lower degenerative cervical spondylosis," which is a chronic finding with the cervical spine that typically indicates a narrowing type of change. (Romano Depo. 40:25-41:1; EX. 11: Grand Strand RMC 00089)  Dr. Romano testified cervical spondylosis can be exacerbated by a traumatic event such as a motorcycle crash, and she also testified that for patients 55 years of age and older the risk of injury increases following traumatic events because the body weakens with age, and its ability to recover from traumatic events is reduced. (Romano Depo. 41:8-18, 76:13-77:4)  According to Dr. Romano, headaches, dizziness, nausea, and difficulties with memory are symptoms typically associated with a closed head injury like Halstead suffered, and such symptoms can appear on a delayed basis following a traumatic event. (Romano Depo. 82:11-83:17)

13.     Halstead was admitted to the hospital overnight for pain management. (Romano Depo. 30:18-19)  By the time of discharge, Halstead's diagnoses had evolved to include closed head injury with loss of consciousness, left 1st costochondral junction nondisplaced fracture, multiple contusions, multiple abrasions, right hip hematoma, nasal bone fracture, 3cm chin laceration, 1cm lip laceration, and acute pain due to trauma. (Romano Depo. 37:21-38:11; EX. 11: Grand Strand RMC 00006)  Upon discharge, Halstead was prescribed hydrocodone for continued pain management and instructed to ambulate with assistance as tolerated and to follow-up with his primary care physician in 7 to 10 days for suture removal. (Romano Depo. 38:12-40:9)

14.     Halstead returned home to Newton Grove, North Carolina, on September 13, 2015. (Tr. 51:8-10)  His son, Ian Halstead ("Ian"), drove him. (Tr. 50:25-51:1)

15.     At trial, Halstead acknowledged having various pre-existing injuries that necessitated medical treatment over the years prior to the accident.  He broke his right leg in the early 1980's while in the Air Force. (Tr. 53:13-18)  This injury was treated with a cast for six to eight weeks and did not result in any lingering problems. (Tr. 54:7-11, 19-20)   Not long after his cast was removed, Halstead stepped off the back of a truck while helping a friend move and injured his back. (Tr. 53:19-24)  He treated his back injury through physical therapy and testified he returned to normal functioning once he completed his therapy course. (Tr. 54:12-18, 249:19-250:1)  In the 1990's, Halstead injured his left shoulder while lifting weights and treated this injury through physical therapy also. (Tr. 53:24-54:1, 54:21-55:6)  He testified this injury resolved itself and no longer bothered him until after the accident at issue. (Tr. 198:12-200:1, 250:2-10)   Halstead received a disability rating of 30% through the Veterans Affairs Administration for these three injures. (Tr. 55:12-56:7)  In January 2014, Halstead had left shoulder surgery to repair a "SLAP" tear injury. (Tr. 51:23-52:5).  He testified he was able to return to his normal workout routine, which included going to the gym four to five days a week to workout with free weights and machines following the surgery and post-operative physical therapy. (Tr. 52:1-5)   Halstead testified he was "in great shape" in the months preceding the motorcycle accident and was not actively treating for any problems in his neck, back, shoulders, or elbows in 2015. (Tr. 53:3-7, 119:3-14)

16.     On September 14, 2015, two days after the motorcycle accident, Halstead was seen at the emergency department at Betsy Johnson Hospital in Dunn, North Carolina, for bilateral hip pain, left ankle and knee pain, and right ankle and knee pain.  (EX. 4: Betsy Johnson Hospital 00001-

00020)  He underwent additional imaging studies, including x-rays to his left knee, left lower leg, left ankle, right knee, right lower leg, right ankle, right foot, and pelvis.  These x-rays revealed contusions and soft swelling without fracture.  (EX. 4: Betsy Johnson Hospital 00002-00009)  Halstead also reported problems with his memory during this visit. (EX. 4: Betsy Johnson Hospital 00017)

17.    Halstead transitioned into the care of Dunn Medical Services, his primary care provider, on September 18, 2015. (EX. 9: Dunn Medical Services 00048)  Records indicate he complained primarily of chest wall tenderness, and pain and swelling in his right leg and hip, during this initial visit. (EX. 9: Dunn Medical Services 00048, 00050)  Heather Parker ("Parker"), the physician's assistant who initially managed his care, referred him for a chest x-ray. (Tr. 62:5-20; EX. 9: Dunn Medical Services 00050)   The x-ray was performed at Betsy Johnson Hospital on September 18, 2015, and it revealed a small left pleural effusion and possible occult left-sided rib fractures. (EX. 36: Halstead_Harnett_037)

18.    Halstead returned to Dunn Medical Services on September 21, 2015, to have the sutures removed from his lips and chin, and during this visit he also reported short term memory loss, continued chest pain, lower right leg pain, and right shoulder pain. (EX. 9: Dunn Medical Services 00044, 00046)  Records indicate the specific problem with his memory was remembering peoples' names. (EX. 9: Dunn Medical Services 00044)  Parker referred Halstead to Betsy Johnson Hospital for additional imaging studies. (EX. 9: Dunn Medical Services 00046)  Later that day, Halstead underwent a magnetic resonance imaging ("MRI") of his brain and x-rays of his chest, lower right leg, right ankle, right foot, and right shoulder at Betsy Johnson Hospital. (EX. 36: Halstead_Harnett_0031 - _0036)  Aside from the chest x-ray, which demonstrated a small left

pleural effusion, these studies showed no significant abnormalities or acute injury. (EX. 36: Halstead_Harnett_0031 - _0036)

19.    On September 25, 2015, Parker referred Halstead to Tricare Counseling & Consulting, Inc. ("Tricare Counseling") for treatment of his psychological trauma from the accident. (EX. 9: Dunn Medical Services, 00231)

20.    Halstead was seen again at Dunn Medical Services on September 29, 2015. (EX. 9: Dunn Medical Services 00041)  During this visit, Halstead reported some of his pain was improving, but he also reported still having pain in his chest around his ribs and in his right knee and lower right leg.  He also reported the hematoma on his right hip had not gotten any better and remained painful. (EX. 9: Dunn Medical Services 00041)   Records indicate Halstead was continuing to use a spirometer to assist with his breathing at this point in time. (EX. 9: Dunn Medical Services 00043) Following this evaluation, Parker referred Halstead for additional imaging studies on his chest and right leg, and for a surgical consult on his right hip hematoma. (EX. 9: Dunn Medical Services 00043)

21.    On September 29, 2015, Halstead underwent a chest CT scan and a MRI of his lower right leg at Betsy Johnson Hospital. (EX. 36: Halstead_Harnett_0028 - _0029)  According to these records, the chest CT scan showed "findings suspicious for occult nondisplaced facture at the extreme anterior of the left 1st rib adjacent to the sternum," and the MRI showed "diffuse subcutaneous soft tissue edema and minimal edema in the mid tibia/fibular syndesmosis.  Faint intramuscular edema with tibialis anterior consistent with muscle strain.  More confluent edema anteriorly suggesting hematoma."  (EX. 36: Halstead_Harnett_0028 - _0029)

22.    On September 29, 2015, Halstead was referred to Cape Fear Valley Harnett Surgical for further evaluation of the mass on his right buttock, and was seen by Dr. Sanford Hawkins-Rivers

("Dr. Hawkins-Rivers"). (EX. 12: Harnett Surgical 00002, 00004)  Dr. Hawkins-Rivers' records from this visit note Halstead described a burning sensation that radiated down his leg, a pain intensity of 6/10, and an inability to lie on his side due to pain from the mass. (EX. 12: Harnett Surgical 00002)  Dr. Hawkins-Rivers' impression of the injury was "radiating burning pain probably secondary to sciatic nerve pressure from hematoma." (EX. 12: Harnett Surgical 00004) Halstead was subsequently scheduled to have the hematoma surgically evacuated. (EX. 12: Harnett Surgical 00004)

23.     Halstead underwent a right gluteal hematoma evacuation on October 1, 2015. (EX. 12: Harnett Surgical 00005)  Dr. Hawkins-Rivers performed the surgery. (Tr. 69:7-14; EX. 12: Harnett Surgical 00005)  The surgical wound was packed with gauze at the conclusion of the procedure, and Halstead was instructed to follow-up with the wound clinic post-operatively. (EX. 12: Harnett Surgical 00005-00007)

24.     Halstead received post-surgical wound care at both Betsy Johnson Hospital and his home from Integrated Wound Care Specialists of North Carolina from October 2, 2015, through November 16, 2015. (EX. 4: Betsy Johnson Hospital 00066-00068, 00087-00088, 00113-00114, 00141-00142, 00161-00160, 00171-00170, 00181-00180, 00196-00197; EX. 14: Integrated Wound Specialists 00001-00014; Tr. 69:25-70:10)  Halstead testified the wound care course was completed at home with the assistance of his wife.  (EX. 14; Tr. 69:15-70:10).  Halstead testified he experienced some relief following the hematoma's evacuation, primarily from pressure being relieved in the area, but he continued to experience an extreme burning and shooting sensation that would shoot down his right leg and into his foot following the evacuation. (Tr. 70:11-71:9) Halstead initially managed this condition through medication and by keeping pressure off of his right side. (Tr. 71:10-23)

25.    Halstead was seen again at Dunn Medical Services on October 13, 2015. (EX. 9: Dunn Medical Services 00038)  Records indicate he reported doing better though still having pain. Parker noted on this visit that Halstead reported a "catching" sensation in his right shoulder, pain in his left elbow when pressure was applied, and ongoing swelling, stiffness, and limited range of motion in his right leg. (EX. 9: Dunn Medical Services 00039)  Records indicate Parker referred Halstead to Dr. Jay Parikh ("Dr. Parikh"), a local orthopedist, for further evaluation, and also recommended Naprosyn for the ongoing hematoma pain. (EX. 9: Dunn Medical Services 00040, 00037)

26.    On October 22, 2015, Halstead was seen by Tracy Christensen ("Christensen"), Dr. Parikh's physician's assistant, at Orthopaedic Solutions & Sports Medicine Center ("Orthopaedic Solutions") in Dunn, North Carolina. (EX. 16: Ortho Solutions 00003)  During this visit, Halstead was noted to have had right knee pain since the motorcycle accident. (EX. 16: Ortho Solutions 00003)  Halstead reported the pain, which was located on the medial and superior aspect of the knee, and rated as being 8/10 at its worst, 2/10 at its best, and was aggravated by prolonged walking and extension of his leg when seated. (EX. 16: Ortho Solutions 00003)  Halstead received a Kenalog injection in his right knee during this visit. (EX. 16: Ortho Solutions 00005)

27.    Halstead was initially seen by dentist, Dr. Trey Williams ("Dr. Williams"), on November 10, 2015, to begin treatment for his broken teeth and dental injuries. (Tr. 58:12-59:10; EX. 3) Halstead's top two front teeth were both damaged in the accident.  One had several vertical fractures, the other was broken, and existing crowns were fractured on two of his molars. (EX. 3: A.C. Williams, DDS 00002)  These teeth were repaired with caps and crowns. (Tr. 58:12-16)  The treatment for Halstead's dental injuries took approximately three months. (Tr. 58:12-16; EX. 3: A.C. Williams, DDS 00002-00003)  Halstead described his dental injuries as "extremely painful"

and likened the pain to having been hit in his mouth with a 2x4. (Tr. 61:3-22)  His dental pain resolved around Christmastime 2015, when he received his caps and crowns from Dr. Williams. (Tr. 61:3-22)  Halstead explained that his diet was restricted to only soft foods for a long time after the accident, and he is now unable to eat hard foods, such as candy, or chew ice.  (Tr. 61:3-13, 59:4-14)  He also wears a nightguard on his upper and lower teeth when he sleeps. (Tr. 59:5-60:3)

28.    Halstead returned to Dunn Medical Services on November 12, 2015, with continued pain in his right ankle and foot. (EX. 9: Dunn Medical Services 00032, 00034)  He also reported pain in his neck and left elbow at this point in time. (EX. 9: Dunn Medical Services 00034).  Records indicate Parker ordered Halstead undergo additional x-rays to his right foot and ankle, cervical spine, and left elbow. (EX. 9: Dunn Medical Services 00034)  These x-rays were performed at Betsy Johnson Hospital on November 12, 2015. (EX. 36: Halstead_Harnett_027-_025)  According to records, the right ankle and foot and left elbow x-rays were read as normal. (EX. 36: Halstead_Harnett_025-_026)  The x-ray of the cervical spine indicated "multi-level disc space narrowing with osteophyte formation and multilevel facet arthropathy." (EX. 36: Halstead_Harnett_027)

29.    Halstead followed-up with Christensen at Orthopaedic Solutions for his right knee pain on November 19, 2015. (EX. 16: Ortho Solutions 00006)  According to records, he reported that the Kenalog injection received during his previous visit provided him relief for only three days before constant pain returned. (EX. 16: Ortho Solutions 00006)  Halstead reported the pain, which was primarily on the medial side of the knee, as sharp and stabbing, and rated it as being 6-7/10 at its worst and 4/10 at its best. (EX. 16: Ortho Solutions 00006)  He reported that walking, getting up from seated positions, navigating stairs, and getting dressed aggravated the pain. (EX. 16: Ortho

Solutions 00006) A MRI of the right knee was ordered by Christensen following this visit. (EX. 16: Ortho Solutions 00007)

30.     The right knee MRI was performed at Betsy Johnson Hospital on November 23, 2015, and demonstrated possible subtle free edge radial tearing of the medial meniscus with a small contusion to the medial femoral condyle. (EX. 16: Ortho Solutions 00010)

31.     Halstead was seen by Dr. Paul Kerner at Triangle Orthopaedics on December 7, 2015, for ongoing pain in his right foot and ankle. (EX. 19: Triangle Ortho 00001-00003) According to records, x-rays were obtained and reviewed and read as normal. A MRI of Halstead's right foot and ankle showed edema in the ankle joint but no significant damage. (EX. 19: Triangle Ortho 00003) Records indicate Halstead was diagnosed with a right foot and ankle sprain as a result of the motorcycle accident. (Triangle Ortho 00003)

32.     Halstead followed-up with Dunn Medical Services on December 10, 2015. (EX. 9: Dunn Medical Services 00026) According to records, his complaints at this time were of ongoing pain in his right knee, constant headaches, and difficulty sleeping. (EX. 9: Dunn Medical Services 00026) Records indicate Halstead would awaken while sleeping, thinking about the accident and having nightmares and flashbacks of the collision. (EX. 9: Dunn Medical Services 00026, 00028) Halstead also reported becoming short-tempered with his family, though it was noted he had started seeing a counselor on a weekly basis. (EX. 9: Dunn Medical Services 00028, 00026) Halstead was started on Prozac for post-traumatic stress disorder ("PTSD")/anxiety/depression at this time. (EX. 9: Dunn Medical Services 00028)

33.     Halstead followed-up with Dr. Parikh at Orthopaedic Solutions on December 10, 2015. (EX. 16: Ortho Solutions 00008) During this visit he reported constant, aching pain over the medial aspect of his right knee, though he also reported it as sharp on an intermittent basis. (EX.

13

16: Ortho Solutions 00008) Halstead reported the pain as being aggravated by walking and kneeling, and he rated it as 10/10 at its worst, 2/10 at its best. (EX. 16: Ortho Solutions 00008) Records indicate Dr. Parikh diagnosed Halstead as having a sprain of his medial collateral ligament and recommended physical therapy. (EX. 16: Ortho Solutions 00009)

34.     Halstead received physical therapy for his right knee twice a week at Betsy Johnson Hospital from January 5, 2016, through February 15, 2016. (EX. 5: Betsy Johnson PT 00001-00051; Tr. 79:19-25)

35.     Halstead was seen by Dr. Scottie Roofe ("Dr. Roofe"), an otolaryngologist with Womack Army Medical Center (WAMC) at Fort Bragg, North Carolina, on January 6, 2016, for evaluation of potential residual pain from his nasal fracture. (EX. 9: Dunn Medical Services 00138) According to records, Halstead's chief complaint was of a headache that radiated around his temples and jaws, with a frontal component as well. (EX. 9: Dunn Medical Services 00138) Records indicate Dr. Roofe, based upon review of a maxillofacial CT scan of Halstead from November 25, 2015, concluded Halstead's nasal fracture appeared well-healed and the headaches may have a component of temporomandibular joint dysfunction as a result of the motorcycle accident. (EX. 9: Dunn Medical Services 00138, 00142) Dr. Roofe directed Halstead to follow-up with his primary care provider. (EX. 9: Dunn Medical Services 00142)

36.     Halstead followed-up with Dunn Medical Services on January 14, 2016. (EX. 9: Dunn Medical Services 00025) According to records, he was noted to be improving at this time, though still experiencing anxiety and depression and being quick to anger. (EX. 9: Dunn Medical Services 00025, 00023) Halstead reported the Prozac was helping. (EX. 9: Dunn Medical Services 00025, 00023) He also reported he had stopped taking Norco and was currently taking Naprosyn for pain. (EX. 9: Dunn Medical Services 00023) Halstead reported continuing to do physical therapy on

his right leg twice a week, with the focus being on his hip due to increased pain likely resulting from overcompensation from pain in the lower part of his leg, as well as from his right hip hematoma. (EX. 9: Dunn Medical Services 00025)  Halstead was also noted to have a deviated septum during this visit. (EX. 9: Dunn Medical Services 00025)  He reported still seeing his counselor at Tricare Counseling on a weekly basis. (EX. 9: Dunn Medical Services 00025, 00023) Records indicate Halstead reported feeling ready to return to work, and indicated he planned to do so in February on a part time basis, which he felt would help his mood, not exhaust him physically and emotionally, and also allow for continued physical therapy and counseling visits. (EX. 9: Dunn Medical Services 00025)

37.     Halstead returned to Orthopaedic Solutions on January 21, 2016, for a follow-up on his right knee pain.  (EX. 16: Ortho Solutions 00011)  Records indicate he was diagnosed with a sprained medical collateral ligament in his right knee and chondromalacia patellae. (EX. 16: Ortho Solutions 00012)  Halstead was fitted with a patella stabilizing brace and instructed to wear it with activity.  (EX. 16: Ortho Solutions 00012)  Records indicate he was directed to continue with physical therapy and range of motion exercises to build up his leg muscles. (EX. 16: Ortho Solutions 00012)

38.     Halstead was seen on follow-up at Orthopaedic Solutions on March 3, 2016, for right knee pain. (EX. 16: Ortho Solutions 00017)  Records indicate he was seen during this visit by Dr. Parikh, who recommended he continue his range of motion and strengthening exercises. (EX. 16: Ortho Solutions 00018)

39.     Halstead followed-up with Dunn Medical Services on March 15, 2016. (EX. 9: Dunn Medical Services 00018)  At this time he was noted to have continued burning sensation in his right hip, right knee tenderness, and ongoing right ankle pain. (EX. 9: Dunn Medical Services

00018)  Records indicate Halstead had begun wearing a brace on his right knee by this time, and reported having a right medial meniscus tear that Dr. Parikh hoped would heal on its own over time. (EX. 9: Dunn Medical Services 00018)  Records further indicate Halstead reported having three teeth extracted the previous week and being in temporaries until his permanent dental restorations were ready to be placed. (EX. 9: Dunn Medical Services 00018)  Halstead reported having increased his Prozac dosage since his previous visit in January and found the dosage adjustment helpful. (EX. 9: Dunn Medical Services 00018)  He also reported having stopped seeing his counselor and then experiencing a recurrence of the nightmares and flashbacks of the accident. (EX. 9: Dunn Medical Services 00020)  Records indicate Halstead had significant edema on his right buttock/hip from the hematoma likely due to nerve damage. (EX. 9: Dunn Medical Services 00020)  Halstead reported the pain, numbness, and paresthesia in his right hip area had worsened since his return to work, so Parker started him on a trial of Neurontin, 100mg twice a day, during this visit. (EX. 9: Dunn Medical Services 00020)  According to records, Parker also discussed with Halstead possibly returning to counseling. (EX. 9: Dunn Medical Services 00020)  Halstead was noted to be back at work on a full-time basis as of this visit, and he was characterized as still having some pain but overall steadily improving. (EX. 9: Dunn Medical Services 00020)

40.     Halstead followed-up with Dunn Medical Services on May 25, 2016. (EX. 9: Dunn Medical Services 00014)  During this visit he reported chest pain related to the accident, which he was managing with Naprosyn, ongoing trouble sleeping, specifically waking up around 2:00 a.m. for about an hour before falling back asleep, and, ongoing trouble with his right hip, which would become numb after extended walking, car rides, or sitting down. (EX. 9: Dunn Medical Services 00014)  According to records, Parker's plan for Halstead at this point in time was to re-evaluate his chest with imaging.  Parker noted that, while the edema to his chest wall from the accident had

somewhat improved, Halstead was still quite tender in the area where he had a previous hematoma from the impact with the grill of Cole's car. (EX. 9: Dunn Medical Services 00016)  Parker's plan for Halstead's right hip pain and numbness was to increase his Neurontin dosage and start him on a trial of Temazepam (i.e. Restoril) to help aid his sleep. (EX. 9: Dunn Medical Services 00016)

41.     Halstead underwent a chest CT at Betsy Johnson Hospital on May 27, 2016. (EX. 36: Halstead_Harnett_018)  The scan demonstrated interval improvement in the appearance of the left first rib anteriorly and no acute boney abnormality. (EX. 36: Halstead_Harnett_018)

42.     Halstead followed-up with Dunn Medical Services on July 13, 2016. (EX. 9: Dunn Medical Services 00011)  During this visit, he reported continuing pain and numbness in his right hip, which by now had become more widespread and progressed down his thigh, into his lower right back, and down into his leg. (EX. 9: Dunn Medical Services 00011, 00013)  He reported his co-workers pointing out to him he was frequently rubbing the side of his thigh at work. (EX. 9: Dunn Medical Services 00011)  He reported having a difficult time getting ready in the mornings, and he also reported now noticing pain and tingling in his lower back. (EX. 9: Dunn Medical Services 00011)  Records indicate Halstead reported his entire right leg going numb in response to the straight leg raise test he was given during this visit. (EX. 9: Dunn Medical Services 00013) Halstead reported his anxiety being well-controlled, sleeping well, and not needing to see his therapist any longer. (EX. 9: Dunn Medical Services 00011)  Parker's plan for Halstead at this time was to have him undergo additional x-rays of his right hip, as well as x-rays of his lumbar spine. (EX. 9: Dunn Medical Services 00013)  Parker also increased Halstead's Neurontin dosage in an effort to improve his morning symptoms and possibly the more widespread paresthesias. (EX. 9: Dunn Medical Services 00011)  Parker noted Halstead's anxiety and sleep to be improved, and recommended he continue his current treatment. (EX. 9: Dunn Medical Services 00011)

43.     Halstead's lumbar spine and right hip were x-rayed at Betsy Johnson Hospital on July 13, 2016. (EX. 36: Halstead_Harnett_016, _017)   The lumbar spine x-ray revealed degenerative changes most pronounced at the L5-S1 location; the x-ray of the right hip was unremarkable. (EX. 36: Halstead_Harnett_016, _017)

44.     On July 15, 2016, Parker referred Halstead to Rex Neurosurgery and Spine in Raleigh, North Carolina, for consultation and work up of his ongoing right hip and leg pain. (EX. 9: Dunn Medical Services 00010)

45.     Halstead was seen by Dr. Robert Lacin ("Dr. Lacin"), a neurosurgeon with Rex Neurosurgery and Spine, on August 3, 2016. (EX. 9: Dunn Medical Services 00125-00126; Tr. 72:11-20)  Dr. Lacin noted Halstead had experienced pain in his right thigh since the motorcycle accident.  (EX. 9: Dunn Medical Services 00126)   He noted the pain at times radiated down Halstead's leg, and elevation of the leg caused numbness and tingling down to the right foot. (EX. 9: Dunn Medical Services 00126)  Halstead's right thigh pain was noted to feel like a constant burning. (EX. 9: Dunn Medical Services 00126)  According to records, Dr. Lacin's impression was that Halstead had a "mild injury to the lumbar plexus sensory branches" but was not suffering from lumbar pathology. (EX. 9: Dunn Medical Services 00126)  Dr. Lacin's plan was for Halstead to be referred to a neurologist specializing in pain management for further evaluation and treatment. (EX. 9: Dunn Medical Services 00126)

46.     Halstead was referred to Cape Fear Valley Neurosurgery ("Cape Fear Valley") on August 8, 2016, for further evaluation of what Parker described as a "lumbosacral plexus injury." (EX. 9: Dunn Medical Services 00009, 00122)  Halstead was never seen by any providers at Cape Fear Valley, but on September 12, 2016, Dr. Rhunelle Murray ("Dr. Murray"), a neurologist and the Medical Director there, corresponded with Parker and informed her she had reviewed Halstead's

18

referral and records and spoken with him on the phone about his condition. (EX. 9: Dunn Medical Services 00116)  Records indicate that, based on this, Dr. Murray concluded the pain in Halstead's right leg was the result of a lumbosacral plexus injury from the trauma/hematoma he suffered in the motorcycle accident. (EX. 9: Dunn Medical Services 00116)  Dr. Murray noted the deficit would likely be lifelong, and though potentially subject to subtle improvement, could not be reversed. (EX. 9: Dunn Medical Services 00116)  Dr. Murray further indicated that Cape Fear Valley did not manage pain and could not do anything to help Halstead, so she recommended he be referred to a comprehensive pain center for evaluation of modalities that might effectively address his pain. (EX. 9: Dunn Medical Services 00116)

47.     On September 16, 2016, Parker referred Halstead to Advanced Spine & Pain Center in Benson, North Carolina, for pain management consultation and work up of his right leg and thigh pain. (EX. 9: Dunn Medical Services 00008, 00113-114)

48.     Halstead returned to Dunn Medical Services on January 23, 2017, at which time he was seen by physician's assistant Gerald Brenneman ("Brenneman") because Parker no longer worked there. (EX. 9: Dunn Medical Services 00005; Tr. 62:5-23)  Halstead reported still not sleeping through the night, and he also reported now having pain and burning in his hands and feet. (EX. 9: Dunn Medical Services 00005, 00007)  Records indicate Halstead exhibited tenderness to palpation in his lumbosacral spine and at his SI joint, and still reported his entire right leg going numb in response to the straight leg raise test. (EX. 9: Dunn Medical Services 00006)  According to records, Brenneman's impression at this time was that Halstead's injuries from the motorcycle accident remained unresolved, and his plan was to refer Halstead to a psychologist, to pain management, and to orthopedic surgery for further evaluation of his right knee. (EX. 9: Dunn

Medical Services 00007)  Brenneman also adjusted Halstead's Temazepam and recommended he start taking Naprosyn again. (EX. 9: Dunn Medical Services 00005)

49.     Halstead was seen by Carol Drescher ("Drescher"), a nurse practitioner at Interventional Pain Center in Dunn, North Carolina, on February 28, 2017, for his right leg and knee pain. (EX. 9: Dunn Medical Services 00077)  According to records, Halstead's pain, which he characterized as constant, severe, and burning, was noted to radiate to the right posterior thigh, right calf, and right foot at the time. (EX. 9: Dunn Medical Services 00077)  His pain was rated to be 8/10 with activities and 3/10 with medication.  Records indicate extended walking and bending over were reported by Halstead as aggravating factors, and the pain was noted to be worse during mornings and cold and rainy weather. (EX. 9: Dunn Medical Services 00077)  Drescher's exam notes indicate Halstead's gait was affected by a right leg limp, he demonstrated decreased range of motion and pain in his right knee, and he demonstrated pain upon palpation over the right posterior thigh and right knee medial and lateral joint line. (EX. 9: Dunn Medical Services 00078)  Drescher noted Halstead had previously treated his symptoms with injections and physical therapy with limited benefit, whereas his knee brace and Gabapentin, Naprosyn, and Percocet had been relatively helpful. (EX. 9: Dunn Medical Services 00079)  Records indicate Drescher diagnosed Halstead with a bucket-handle tear of the right medial meniscus and recommended he undergo an electromyography ("EMG")/nerve conduction study on his right leg, receive a Genicular nerve injection in his knee, begin utilizing a transcutaneous electrical nerve stimulation ("TENS") unit on a permanent basis, and return to physical therapy.  She also recommended massage therapy and weight loss. (EX. 9: Dunn Medical Services 00079-00080)

50.     Halstead returned to Dunn Medical Services on April 24, 2017. (EX. 9: Dunn Medical Services 00291)  Records indicate he had been seen by pain management, orthopedics, and

physical therapy for bilateral knee pain, ankle pain, and shoulder pain as a result of the motorcycle accident. (EX. 9: Dunn Medical Services 00291)  It was further noted Halstead had not yet been seen by neurology, despite the previous referral attempt to Cape Fear Valley. (EX. 9: Dunn Medical Services 00291)  Records indicate the accident caused a large hematoma in Halstead's right hip that required surgery, and ever since the accident, he experienced constant pain in his hip, which radiated down past his knee and into his ankle. (EX. 9: Dunn Medical Services 00291) Records indicate Halstead described the pain as burning, tingling numbness somewhat helped by Neurontin, but when he remains seated for an extended period of time, it feels as though he has been "sitting on a tennis ball." (EX. 9: Dunn Medical Services 00291)  It was noted that Halstead described the pain as "livable" on the Naprosyn and Neurontin, but it was further noted the ongoing pain has affected his life to the point where he had gained weight because he is unable to be physically active due to pain. (EX. 9: Dunn Medical Services 00291)   Records indicate the treatment plan as of this visit was to increase Halstead's Neurontin dosage to 100mg up to five times per day for pain and to refer him for a neurology consultation and evaluation. (EX. 9: Dunn Medical Services 00291)

51.    On May 24, 2017, Halstead was seen on referral by Dr. Michael Pietak ("Dr. Pietak"), a neurologist with Duke Neurology of Raleigh ("Duke Neurology") in Raleigh, North Carolina, for the pain and numbness in his right leg. (Tr. 72:23-73:74:16; EX. 9: Dunn Medical Services 00339-00340; EX. 7: 00003-00004)  Dr. Pietak's records indicate Halstead reported a burning and tingling sensation over his posterior thigh that wrapped around the medial knee and progressed down to the ankle. (EX. 9, Dunn Medical Services 00339-00340; EX. 7: 00003-00004)  Records indicate Halstead reported numbness in his legs when sitting for prolonged periods of time, which would make the burning worse. (EX. 9, Dunn Medical Services 00340; EX. 7: 00003-00004)

Halstead also reported lower back pain during this visit. (EX. 9, Dunn Medical Services 00340; EX. 7: 00003-00004)  Dr. Pietak's records indicate the pain started after Halstead's motorcycle accident in 2015 and was likely the result of compression of the posterior cutaneous nerve of the thigh. (EX. 9: Dunn Medical Services 00343; EX 7: 00003-00004)  Dr. Pietak's plan for Halstead at this time was to undergo an EMG/nerve conduction study of his right leg and increase his Gabapentin (i.e. Neurontin) to 300mg three times a day. (EX. 9: Dunn Medical Services 00343)

52.     Dr. Paul Peterson ("Dr. Peterson"), a colleague of Dr. Pietak's, performed an EMG/nerve conduction study on Halstead on June 14, 2017. (EX. 7, Duke Neurology 00028)  The study results were "essentially normal." (EX. 7: Duke Neurology 00035)

53.     Halstead followed-up with Dr. Pietak on September 26, 2017. (EX. 7: Duke Neurology 00050)  Dr. Pietak noted during this visit he suspected Halstead's symptoms and pain may be originating from injury or compression of the posterior cutaneous nerve of the thigh, and his recommendation was for Halstead to increase his Gabapentin dosage and try a peripheral block of the posterior cutaneous nerve of the thigh. (EX. 7: Duke Neurology 00053)

54.     On October 4, 2017, Halstead saw Dr. Gabe Smith ("Dr. Smith"), a physical medicine and rehabilitation physician with Duke Spine and Pain Management ("Duke Spine") in Raleigh, North Carolina. (Tr. 74:17-75:10; EX. 8: Duke Spine 00001)  Halstead was referred to Dr. Smith by Dr. Pietak for further evaluation of his chronic neuropathic right lower limb pain. (Tr. 74:17-75:10; EX. 8: Duke Spine 00003)  Records indicate Dr. Smith believed Halstead's pain seemed to be affecting the sensory branches overlying his right buttock, which he thought was probably due to irritation of the local branch of the posterior cutaneous nerve of the thigh. (EX. 8: Duke Spine 00007)  Dr. Smith's plan for Halstead following this visit was to start a trial of compound topical cream that could be applied to the focal area of pain and for Halstead to continue physical therapy

and activity as able. (Tr. 75:11-20; EX. 8: Duke Spine 00007)  Dr. Smith also noted that future considerations would include an ultrasound-guided injection of the posterior cutaneous nerve of the thigh. (EX. 8: Duke Spine 00007)

55.    Halstead returned to Dunn Medical Services on October 18, 2017. (EX. 9: Dunn Medical Services 00284)  According to records, Halstead continued complaining of right leg numbness. (EX. 9: Dunn Medical Services 00284)  Records also indicate he had been taking his Neurontin up to five times a day, which was helping some, but still not alleviating the pain. (EX. 9: Dunn Medical Services 00285)  It was noted that Halstead had been following with neurology and would be starting a topical cream for nerve pain, and if the cream was not beneficial, he would try surgery. (EX. 9: Dunn Medical Services 00285)

56.    Halstead returned to Dr. Smith on October 25, 2017, and received an ultrasound-guided injection of his right posterior cutaneous thigh nerve. (Tr. 75:18-76:22; EX. 8: Duke Spine 00032). Halstead tolerated the procedure well and reported 0 out of 10 pain immediately following the procedure; however, his symptoms began to reemerge after a few days. (EX. 8: Duke Spine 00032; Tr. 75:18:76:22)

57.    Halstead was seen at Dunn Medical Services on March 28, 2018. (EX. 9: Dunn Medical Services 00278)  Halstead reported difficulty sleeping and decreased activities of daily living as a result of the accident at this time. (EX. 9: Dunn Medical Services 00278)  He was prescribed Zoloft, 25mg daily, and referred to psychiatry for possible cognitive behavioral therapy. (EX. 9: Dunn Medical Services 00279)

58.    Halstead returned to Dunn Medical Services on April 3, 2018, with complaints of gastrointestinal ("GI") upset due to the Zoloft. (EX. 9: Dunn Medical Services 00278)  Records

indicate the Zoloft was discontinued and Halstead was switched to Celexa instead. (EX. 9: Dunn Medical Services 00277)

59.    Halstead presented to Fayetteville Psychiatric Associates ("Fayetteville Psychiatric") in Fayetteville, North Carolina, on April 17, 2018, where he was seen by Dr. Robert Matlack ("Dr. Matlack"), a psychiatrist. (EX. 10: Fayetteville Psychiatric 00007)   Records indicate a chief complaint by Halstead of "mood and anxiety" and recurrent issues with depression and stress due to the motorcycle accident. (EX. 10: Fayetteville Psychiatric 00007)   Records indicate Halstead was experiencing nightmares and flashbacks, feeling sad most of the time, and experiencing weight gain. (EX. 10: Fayetteville Psychiatric 00007)   Records further indicate Halstead reported experiencing stress and feeling overwhelmed with worrying, as well as having panic attacks marked by shaking, sweating, and trouble calming down. (EX. 10: Fayetteville Psychiatric 00007) He also reported feeling on edge much of the time. (EX. 10: Fayetteville Psychiatric 00007) Records indicate Halstead's behavior was affecting his interaction with others. (EX. 10: Fayetteville Psychiatric 00007)  Halstead was diagnosed with "anxiety disorder, unspecified" and "unspecified mood disorder" during this visit. (EX. 10: Fayetteville Psychiatric 00009)   Dr. Matlack discussed increasing Halstead's Celexa to assist with his mood and stress, and also discussed the benefit of therapy and self-care. (EX. 10: Fayetteville Psychiatric 00009)   An electrocardiogram ("EKG") was ordered to evaluate potential interaction between Trazadone and Celexa. (EX. 10: Fayetteville Psychiatric 00009)   Halstead was directed to follow-up in four weeks. (EX. 10: Fayetteville Psychiatric 00009)

60.    On April 24, 2018, Halstead followed-up with Dr. Smith at Duke Spine for evaluation of his chronic pain and reassessment of the efficacy of treatment. (Tr. 76:23-77:9; EX. 8: Duke Spine 00048).   Records indicate Halstead reported receiving no substantial benefit from the steroid

injection the previous October, and was noted to still be experiencing pain in his posterior buttock and posterior thigh region. (EX. 8: Duke Spine 00048)  The pain was noted to be "quite debilitating," particularly upon sitting or standing for long periods. (EX. 8: Duke Spine 00048) Records indicate Dr. Smith felt Halstead's pain was likely peripheral of the nerve root, though possibly proximal. (EX. 8: Duke Spine 00053)  He discussed with Halstead undergoing a trial S1 and S2 transforaminal steroid injection on his right side, and they also discussed future spinal cord stimulation if this injection was not helpful. (EX. 8: Duke Spine 00053)  Records indicate Dr. Smith diagnosed Halstead with radiculopathy of the sacral region during this visit. (EX. 8: Duke Spine 00054)

61.    Halstead returned to Dunn Medical Services on April 25, 2018. (EX. 9: Dunn Medical Services 00278)  Records for this visit indicate Halstead reported ongoing headaches due to anxiety and stress as well as pain in his left knee, which he attributed to overuse from compensating for the problems with his right hip and leg. (EX. 9: Dunn Medical Services 00271)  Records indicate Halstead was referred for an x-ray of his left knee following this visit. (EX. 9: Dunn Medical Services 00273)

62.    Halstead followed-up with Dr. Smith for a right S1 and S2 transforaminal epidural steroid injection on May 4, 2018. (Tr. 77:10-21; EX. 8: Duke Spine 00062)  The injection consisted of a 3ml solution consisting of 10mg dexamethasone and 1% lidocaine being injected into the epidural space at Halstead's S1 level. (EX. 8: Duke Spine 00062)  The same procedure was then performed at Halstead's S2 level. (EX. 8: Duke Spine 00062)

63.    Halstead testified this injection from Dr. Smith, like the previous one, provided him modest relief for a brief time, but his pain eventually returned. (Tr. 77: 10-21; EX. 8: Duke Spine 00075) Thereafter, Halstead continued experiencing the same pain in his lower right extremity. (Tr. 77:22-

78:6)  He continued to struggle with depression and became resigned to attempting to manage the pain on his own by limiting his physical movements and activities. (Tr. 77:22-78:6)

64.    Halstead returned to Dunn Medical Services on May 9, 2018. (EX. 9: Dunn Medical Services 00267)  He reported an ongoing three-month headache during this visit. (EX. 9: Dunn Medical Services 00267)  Records indicate Halstead underwent a left knee x-ray on April 23, 2018, and a MRI of the knee was scheduled for May 11, 2018, due to complaints of left knee pain. (EX. 9: Dunn Medical Services 00269)

65.    Halstead returned to Fayetteville Psychiatric on May 15, 2018. (EX. 10: Fayetteville Psychiatric 00004)  Records indicate ongoing issues with his mood several days a week as well as continued problems with stress, and he was noted to appear anxious and sad. (EX. 10: Fayetteville Psychiatric 00004-00005)  He was also noted to be having occasional nightmares. (EX. 10: Fayetteville Psychiatric 00004)  Records indicate the treatment plan at this time was to increase Halstead's Celexa to help with mood and stress and to continue Trazadone for sleep. (EX. 10: Fayetteville Psychiatric 00005)  Taking care of himself through hobbies, such as photography, was discussed.  Therapy was also discussed though declined by Halstead at this time. (EX. 10: Fayetteville Psychiatric 00005)  Halstead was instructed to follow-up in four weeks. (EX 10: Fayetteville Psychiatric 00006)

66.    Halstead returned to Dunn Medical Services on May 16, 2018. (EX. 9: Dunn Medical Services 00263)  Records indicate the results of his recent left knee MRI were discussed, which showed a likely posterior rim tear of the meniscus. (EX. 9: Dunn Medical Services 00263, 00265)

67.    Halstead returned to Fayetteville Psychiatric on June 12, 2018. (EX. 10: Fayetteville Psychiatric 00001)  Records indicate the increased Celexa was helping, and the quality of Halstead's mood was somewhat improved. (EX. 10: Fayetteville Psychiatric 00001)  Halstead

reported being interested in therapy during this visit, and records indicate he planned to "look locally" for a therapist to see. (EX. 10: Fayetteville Psychiatric 00001-00002)

68.     Halstead returned to Orthopaedic Solutions on July 12, 2018, for a follow-up of bilateral knee pain from the motorcycle accident. (EX. 16: Ortho Solutions 00035)  He reported sharp, stabbing, aching, and throbbing pain in his left knee during this visit and rated his pain as 10/10 at its worst, 3-4/10 at its best. (EX. 16: Ortho Solutions 00035)  He was given a steroid injection in his left knee. (EX. 16: Ortho Solutions 00035)  Records indicate Dr. Parikh diagnosed Halstead with unilateral primary osteoarthritis in his left knee, derangement of the posterior horn of his medial meniscus due to an old injury or tear, and recommended conservative treatment at this time. (EX. 16: Ortho Solutions 00036)  It was noted Halstead may need arthroscopic surgery in the future. (EX. 16: Ortho Solutions 00036)

69.     Halstead returned to Dunn Medical Services on September 6, 2018. (EX. 9: Dunn Medical Services 00369)  He was seen by physician's assistant Constance Page (Page) during this visit. (EX. 9: Dunn Medical Services 00369)  Records indicate Halstead had continued complaints of pain in his left knee and foot at this time. (EX. 9: Dunn Medical Services 00369)  He reported Dr. Parikh told him surgery would be needed on the knee, and records indicate Halstead wanted a referral for a second opinion. (EX. 9: Dunn Medical Services 00369)  Halstead was referred to Raleigh Orthopaedics for his left knee following this visit. (EX. 9: Dunn Medical Services 00371; Page Depo. 63:8-18)

70.     Halstead returned to Dunn Medical Services on November 8, 2018. (EX. 9: Dunn Medical Services 00365)  He reported no longer taking Celexa due to headaches and asked to switch to something else. (EX. 9: Dunn Medical Services 00365)  Records indicate Halstead's anxiety and depression had worsened at this time. (EX. 9: Dunn Medical Services 00365)  Records further

indicate he was scheduled to be seen at Raleigh Orthopaedics for his left knee in December 2018. (EX. 9: Dunn Medical Services 00367)

71.     Halstead was seen by Dr. Bradley Vaughn ("Dr. Vaughn"), an orthopedic surgeon with Raleigh Orthopaedics in Raleigh, North Carolina, on December 6, 2018, for a second opinion on the potential need for surgery to address his left knee pain. (EX 17: Raleigh Orthopaedic 00002) Records indicate Halstead reported the pain started following the motorcycle accident three years earlier but had worsened over time. (EX 17: Raleigh Orthopaedic 00002) Halstead reported symptoms of loss of strength and motion, stiffness, swelling, numbness, and tingling during this visit, and he rated the pain as being 7/10 during the visit, though 10/10 at its worst. (EX 17: Raleigh Orthopaedic 00002) He reported the pain being aggravated by getting dressed and getting up from a bed or chair. (EX 17: Raleigh Orthopaedic 00002) Records indicate Dr. Vaughn determined Halstead's MRI from May 11, 2018, indicated a meniscus tear on the medial side of the left knee and some early arthrosis. (EX 17: Raleigh Orthopaedic 00001-00002) It was noted that a previous steroid injection, and continued Naprosyn, were not providing Halstead any relief. (EX 17: Raleigh Orthopaedic 00002) Dr. Vaughn recommended continued conservative treatment in the form of a patella stabilizing brace and physical therapy at this time. (EX 17: Raleigh Orthopaedic 00004)

72.     Dr. Vaughn ordered Halstead to undergo physical therapy three times a week for four weeks to treat his left meniscus tear and patella subluxation. (EX. 5: Betsy Johnson PT 00061) Halstead began his therapy course on January 11, 2019, and completed it on February 5, 2019, at Betsy Johnson Hospital. (EX. 5: Betsy Johnson PT 00081-00159)

73.     Halstead underwent a MRI of his cervical spine at Betsy Johnson Hospital on March 19, 2019. (EX. 36: Halstead_Harnett_011)     The study was ordered by Page. (EX. 36: Halstead_Harnett_011)

74.     On May 10, 2019, Halstead was seen for his neck pain and left arm numbness by Dr. Mark Mikles ("Dr. Mikles") at Raleigh Orthopaedic. (EX. 17: Raleigh Orthopaedic 00008)  During this visit, Halstead reported having experienced chronic neck pain and numbness and tingling in his left arm since the motorcycle accident, and he further reported the pain increased with neck rotation, standing, and walking, but improved with rest. (EX. 17: Raleigh Orthopaedic 000008) Records indicate Halstead rated the pain as a 10/10 during this visit. (EX. 17, Raleigh Orthopaedic 00008)  Dr. Mikles reviewed the March 19, 2019, MRI with Halstead, which demonstrated "multilevel cervical spondylosis from C3-C7 with disc and disc osteophyte complex and moderate central and foraminal stenosis bilaterally at C4-5 but no large disc herniation no fractures no myelomalacia." (EX. 17: Raleigh Orthopaedic 00010)  Dr. Mikles assessed Halstead as having "cervical spondylosis and recurrent neck pain and periscapular pain and diffuse left arm paresthesias." (EX. 17: Raleigh Orthopaedic 00010)  Dr. Mikles discussed with Halstead that he most likely had "pre-existing asymptomatic cervical spondylosis and disc bulging that most likely was exacerbated by his motor vehicle accident." (EX. 17: Raleigh Orthopaedic 00010)  Records indicate Halstead could consider "epidural steroid injections and/or a nerve conduction test to better evaluate for peripheral nerve compression." (EX. 17, Raleigh Orthopaedic 00010)

75.     Halstead was seen by Dr. Peng Bai ("Dr. Bai"), a physician with the Carolina Spine Center in Raleigh, North Carolina, on June 26, 2019. (EX. 6: Carolina Spine Center 00016; Bai Depo. 9:20-24; EX. 6: Carolina Spine Center 00016)  He was seen on referral from Dr. Mikles for an EMG study to evaluate his ongoing neck and left arm pain.  (EX. 6: Carolina Spine Center 0007) Dr. Bai is board certified in physical medicine and rehabilitation, and fellowship trained in interventional spine. (Bai Depo. 6:7-12)  His testimony was presented by video deposition.

76.     Dr. Bai performed the EMG study on July 8, 2019. (Bai Depo. 12:18-23)  According to Dr. Bai, the study revealed left ulnar neuropathy/cubital tunnel syndrome and chronic cervical radiculopathy, possibly at the C5 location. (Bai Depo. 12:15-22; EX. 6: Carolina Spine Center 00010)

77.     Because Halstead was already in the process of being evaluated for potential surgical repair of his injury at Raleigh Orthopaedics, Dr. Bai administered a left cervical transforaminal epidural injection at the C4-5 and C6-7 locations on July 15, 2019, to assess the extent to which his symptoms were contributing to the cervical radiculopathy. (Bai Depo. 12:24–13:6; EX. 6: Carolina Spine Center 00009)  These injections were intended to reduce any inflammation from an irritated nerve emanating from Halstead's spine. (Bai Depo. 13:15-18)   Dr. Bai testified these injections helped Halstead's neck and shoulder pain "significantly," though his hand pain persisted. (Bai Depo. 14:18-15:15, 36:20-22)

78.     Halstead was again seen by Dr. Bai on August 5, 2019, and reported increased pain in his lower back and radicular pain in his right leg. (Bai Depo. 14:18-15:15; EX. 6: Carolina Spine Center 00002-00005)  Dr. Bai gave Halstead a right S1 transforaminal steroid injection during this visit. (Bai Depo. 15:9-11;  EX. 6: Carolina Spine Center 00002-00005)

79.     On August 6, 2019, Halstead was seen by Dr. Matthew Boes ("Dr. Boes"), an orthopedic surgeon at Raleigh Orthopaedic. (Boes Depo. (8/14/20) 6:11-17; EX. 17: Raleigh Orthopaedic 00011)  Dr. Boes' testimony was presented by video deposition.

80.     Halstead presented to Dr. Boes with complaints of tenderness along the inside of his left elbow adjacent to the medial epicondyle and along the cubital tunnel. (Boes Depo. (8/14/20) 10:4-6)  He also had a positive Tinel's sign at the cubital tunnel and a positive elbow hyperflexion test, along with some decreased sensation in the ulnar digits of the left hand, all of which were indicative

of cubital tunnel syndrome. (Boes Depo. (8/14/20) 10:6-12)  Dr. Boes diagnosed Halstead with cubital tunnel syndrome during this visit and recommended he begin a conservative course of treatment consisting of nighttime elbow splinting and an anti-inflammatory gel. (Boes Depo. (8/14/20) 12:1-25)

81.     Halstead was seen on follow-up by Dr. Boes on September 3, 2019, at which time the results of the EMG study from July 8, 2019, were reviewed with him. (EX. 17: Raleigh Orthopaedic 00014–15; Boes Depo. (8/14/20) 13:16-24)  The study revealed evidence of ulnar neuropathy at the cubital tunnel, as well as evidence of C5 radiculopathy in the cervical spine. (EX. 17: Raleigh Orthopaedic 00015; Boes Depo. (8/14/20) 13:16-24)  The decision was made during this visit to proceed with surgery on Halstead's left elbow. (Boes Depo. (8/14/20) 13:25-14:8)

82.     Dr. Boes performed a left anterior subcutaneous nerve transposition to Halstead on October 2, 2019. (Boes Depo. (8/14/20) 15:16-18; EX. 17: Raleigh Orthopaedic 00021)  The goal of the surgery was to release the pressure being put on the nerve in the cubital tunnel of Halstead's left elbow. (Boes Depo. (8/14/20) 14:9-16)  Halstead was released to his home post-operatively in a compression dressing to control swelling, and in a splint to help limit motion at his elbow at the beginning of the healing process. (Boes Depo. (8/14/20) 15:20–16:2)

83.     Post-operatively, Halstead followed-up with Dr. Boes on October 11, 2019, at which time he was taken out of his splint and instructed to begin light use of his elbow with pain as his guide. (EX. 17: Raleigh Orthopaedic 00023-24)  He was also instructed to start occupational hand therapy to promote increased range of motion and progressive strengthening. (EX. 17: Raleigh Orthopaedic 00024)

84.    Halstead returned to Dr. Boes on November 12, 2019, approximately six weeks post-operatively. (EX. 17: Raleigh Orthopaedic 00026)  He was noted to be working with occupational therapy and doing well with no distal numbness or tingling in the ulnar distribution, with some occasional tingling around the left elbow itself. (EX. 17: Raleigh Orthopaedic 00026)  Halstead reported during this visit that putting direct pressure on his elbow, such as on his armrest while driving, was painful to his elbow. (EX. 17: Raleigh Orthopaedic 00026; Tr. 86:6-20)  Halstead was instructed to increase activities as tolerated, but to avoid any heavy weightlifting or body weight exercises, such as push-ups or planks, for another six weeks. (EX. 17: Raleigh Orthopaedic 00027)  He was also instructed to follow-up with Dr. Boes as needed for his left elbow. (EX. 17: Raleigh Orthopaedic 00027)

85.    Halstead received occupational therapy following his left elbow surgery at WAMC from October 21, 2019, through February 11, 2020 (EX. 20: WAMC PT 00001-00053)

86.    Dr. Boes testified cubital tunnel syndrome can be caused by lots of things, including repetitive use of the arm or a single stress injury such as a direct blow to the elbow. (Boes Depo. (8/14/20) 35:6-20)  Even when the injury is brought on by a traumatic event, the symptoms can "smolder" and slowly worsen over time. (Boes Depo. (8/14/20) 36:20–37:7)  Dr. Boes opined that Halstead's left elbow injury and subsequent course of treatment, including the left anterior subcutaneous nerve transposition surgery, resulted from and was caused by the motorcycle accident on September 12, 2015. (Boes Depo. (8/14/20) 17:22–18:16, 38:24–39:7)

87.    Halstead testified his left elbow was much improved after the left anterior subcutaneous nerve transposition surgery, but he still experiences some numbness, tingling, and sensitivity in the area, particularly when it comes in contact with hard surfaces. (Tr. 86:22-25)

88.    Halstead underwent an x-ray of his right shoulder and right elbow on February 5, 2020, at Betsy Johnson Hospital due to complaints of pain in those areas. (EX. 17: Raleigh Orthopaedic 00029-30)  The x-rays were ordered by Page. (EX. 17: Raleigh Orthopaedic 00029-30)

89.    Halstead returned to Dr. Boes on March 3, 2020, reporting pain in his right shoulder and elbow. (EX. 17: Raleigh Orthopaedic 00031; Boes Depo. (8/14/20) 18:17–19:10)  Halstead reported these symptoms initially began after the motorcycle accident, though the pain had gradually progressed over time and now included "loss of strength, popping, grinding, loss of motion, numbness, stiffness, swelling[,] and tingling." (EX. 17: Raleigh Orthopaedic 00031)  Dr. Boes noted the pain seemed to be related primarily to range of motion in Halstead's neck. (EX. 17: Raleigh Orthopaedic 00031)  Dr. Boes reviewed with Halstead the previous MRI of his cervical spine and advised him the pain was likely "referred pain from significant degenerative change in his neck" as opposed to a problem with his shoulder or elbow. (Boes Depo. (8/14/20) 20:9-24, 51:3-12l; EX. 17: Raleigh Orthopaedic 00033)  At the conclusion of this visit, Dr. Boes placed Halstead on a course of Meloxicam and referred him to Dr. Bai for evaluation and workup, as well as possible epidural injections. (EX. 17: Raleigh Orthopaedic 00033; Boes Depo. (8/14/20) 20:13-24)

90.    Dr. Boes testified both he and other providers at Raleigh Orthopaedics routinely refer patients with neck or spine problems to Carolina Spine for an initial workup. (Boes Depo. (8/14/20) 27:11–28:2)

91.    On March 17, 2020, Halstead was seen by Dr. Bai for his neck and right shoulder pain, as well as increasing lower back pain. (EX. 6, Carolina Spine Center 00037).  Halstead reported pain in his neck and right shoulder during the mornings, along with weakness in his right arm. (EX. 6, Carolina Spine Center 00037)  Halstead also reported taking Mobic to manage his pain at this time.

(EX. 6, Carolina Spine Center 00037)  Dr. Bai administered Halstead a transforaminal steroid injection at the right C4-5 and C6-7 location during this visit. (EX. 6, Carolina Spine Center 00039)

92.     On March 31, 2020, Halstead returned to Dr. Bai due to increased pain in his lower back and right leg along the S1 distribution. (EX. 6, Carolina Spine Center 00035)  The previous injections at C4-5 and C6-7 were noted to have provided him relief for a few days prior to his pain returning. (EX. 6, Carolina Spine Center 00031)  Halstead reported continuing to have pain radiate down his arm and cause numbness in his fingers. (EX. 6, Carolina Spine Center 00031) Dr. Bai gave Halstead a bilateral S1 transforaminal steroid injection during this visit. (Bai Depo. 15:10-12; EX. 6, Carolina Spine Center 00035)  Dr. Bai's records indicate diagnoses of cervical radiculopathy, other cervical disc degeneration, paresthesia of the skin, other chronic pain, lesion of left ulnar nerve, lumbar spinal stenosis, and lumbar radiculopathy as of this date. (EX. 6, Carolina Spine Center 00034)

93.     Dr. Bai testified all of the problems he treated Halstead for in 2019 and 2020 were most likely the result of, and caused by, pre-existing, arthritic changes in Halstead's neck and lower back being exacerbated by the motorcycle accident on September 12, 2015. (Bai Depo. 18:4-17, 19:15-25)

94.     Halstead underwent a MRI of his lumbar spine at Dr. Bai's request on August 26, 2020, at Betsy Johnson Hospital. (EX. 6: Carolina Spine Center 00044)  The MRI report indicates Halstead had disc bulges and facet arthropathy at L3-4, L4-5, and L5-S1, as well as left lateral disc protrusion at L3-4. (EX. 6: Carolina Spine Center 00044 – 00045)

95.     Dr. Bai testified future exacerbations of Halstead's neck and lower back symptoms are likely based on the most recent imaging of his cervical and lumbar spine. (Bai Depo. 20:1-21)  In particular, flexion and rotation to the side will likely cause Halstead pain, and bending forward

and to the right will likely cause increased pressure on his disc, which will be painful as well. (Bai Depo. 21:7-18)  Dr. Bai testified activities such as lawn mowing will likely cause irritation to Halstead's joints and back. (Bai Depo. 21:7-18)

96.     Dr. Bai testified Halstead was a compliant patient throughout his treatment. (Bai Depo. 22:5-10)

97.     With respect to potential future treatment, Dr. Bai testified that any exacerbation in symptoms would likely be treated conservatively at first by restarting Halstead's medications and recommending physical therapy for any exacerbations that limit function.  Repeat transforaminal steroid injections would also be recommended to help reduce inflammation. (Bai Depo. 23:14-24) Dr. Bai further testified if Halstead's symptoms were to progress to the point where medications and injections are no longer effective, spinal cord stimulation and/or surgery would become viable options. (Bai Depo. 23:25–24:9)

98.     Halstead returned to Dr. Pietak at Duke Neurology on June 21, 2021, due to ongoing right leg pain. (EX. 7: Duke Neurology 00075)  He reported pain continuing to radiate down his right leg and into his foot when sitting for prolonged periods of time. (EX. 7: Duke Neurology 00076) He also reported similar symptoms beginning in his left leg approximately two years earlier. (EX. 7: Duke Neurology 00075)  Records indicate Halstead inquired about a spinal cord stimulator to help with his symptoms, and Dr. Pietak explained to Halstead he had more medication trials to go through before he would qualify as a stimulator candidate. (EX. 7: Duke Neurology 00076)  Dr. Pietak's assessment was that Halstead's right thigh pain was "most consistent with a lesion at the posterior cutaneous nerve of the thigh" and that he should remain on Gabapentin to manage his symptoms, though he should add an extra 300mg dose at midday. (EX. 7: Duke Neurology 00080) With respect to Halstead's left leg, records indicate Dr. Pietak believed the symptoms to be most

consistent with a L5 radiculopathy triggered primarily after prolonged sitting. (EX. 7: Duke Neurology 00081)  He recommended Halstead undergo another lumbar MRI to evaluate for foraminal stenosis and to start physical therapy to manage his active symptoms. (EX. 7: Duke Neurology 00081)  Halstead was instructed to follow-up in three months. (EX. 7: Duke Neurology 00081)

99.    Halstead returned to Dr. Pietak for his lower back and bilateral lower extremity pain on September 21, 2021. (EX. 7: Duke Neurology 00091)  The results of Halstead's most recent MRI from July 15, 2021, were reviewed, which showed a mild degree of arthritic changes and mild neural foraminal stenosis. (EX. 7: Duke Neurology 00095, 00091)  According to Dr. Pietak's assessment, he believed Halstead was suffering from radiculopathic symptoms when in certain positions, but noted those symptoms resolved when Halstead changed positions. (EX. 7: Duke Neurology 00095, 00091)  Dr. Pietak discussed with Halstead strengthening his core muscles, which Halstead was already working on. (EX. 7: Duke Neurology 00096)  Halstead was continuing on Gabapentin, which provided him some relief. (EX. 7: Duke Neurology 00096)  Dr. Pietak's recommendation to Halstead following this visit was to continue his core strengthening exercises, as well as his Gabapentin regimen. (EX. 7: Duke Neurology 00096)  If symptoms worsened, Dr. Pietak indicated the Gabapentin could be increased, additional medications could be considered, or Halstead could be referred to a peripheral nerve surgeon for consultation. (EX. 7: Duke Neurology 00096)  Dr. Pietak recommended that Halstead contact him if symptoms worsened. (EX. 7: Duke Neurology 00096)

100.    Steve Jones ("Jones") is a  psychiatric mental health nurse practitioner with Living Well Behavioral Health ("Living Well") in Fayetteville, North Carolina. (Jones Depo. 6:19-7:22) Jones practices in collaboration with Dr. Eric Mazelle, the psychiatrist with Living Well, and is able to

independently diagnose patients and prescribe medications. (Jones Depo. 9:16-24, 9:25-10:5, 69:10-19)  Jones' testimony was presented by video deposition.

101.     Jones initially saw Halstead upon referral from his primary care provider on April 27, 2020, following Halstead's dissatisfaction with his previous psychiatric provider. (Jones Depo. 11:12-12:5; EX. 15: Living Well 00003-00008)  Jones testified that in the history Halstead provided during this initial visit, he described the motorcycle accident, including the concussive injury he sustained. (Jones Depo. 16:12-22; EX. 15: Living Well 00003)  Halstead's chief complaint at this time was of ongoing problems with stress, anger, agitation, depression, and anxiety following the motorcycle accident. (Jones Depo 13:24-14:20; 68:4-69:9)  Jones testified these symptoms were among "the constellation of symptoms" typically associated with PTSD. (Jones Depo. 14:15-20)  Based on Halstead's history, Jones diagnosed Halstead with PTSD and other recurrent depressive disorders, and he also recommended changes in Halstead's current medications. (Jones Depo. 19:10-18, 24:15-27:21, 70:9-71:14, 73:21-75:4)  Because Jones determined Halstead to be depressed based predominantly on his trauma-based symptoms of recurring intrusive thoughts, nightmares, and flashbacks related to the accident, and those symptoms' impact on Halstead's mood, he recommended Halstead discontinue Trazadone and begin a trial of Lexapro and Doxepin instead. (Jones Depo. 19:19-20:2)  Lexapro treated Halstead's mood, and Doxepin treated his insomnia. (Jones Depo. 28:22-29:19)  The treatment plan Jones recommended for Halstead consisted of ongoing psychosocial therapy and pharmacotherapy (i.e. medication). (Jones Depo. 27:22-28:3)

102.     Jones testified Halstead followed-up with him on May 26, 2020, and reported adverse side effects from the Lexapro, so the decision was made to transition to Wellbutrin. (Jones Depo. 33:23-

37:21)  Halstead's treatment plan otherwise remained the same at this time. (Jones Depo. 36:23-37:6)

103.    Halstead followed-up with Jones on June 17, 2020. (Jones Depo. 37:22-38:2)  During this visit, Halstead exhibited symptoms of ongoing depression, anxiety, and feeling more agitated and irritable, so Jones discontinued the Wellbutrin. (Jones Depo. 38:3-11)  Jones, who also provided limited psychotherapy services to Halstead in addition to medication management, counseled Halstead on some mitigation techniques to help control his anger and irritability.  (Jones Depo. 31:2-10, 38:7-39:2, 83:6-19, 83:20-84:23, 84:24-86:16)   Jones started Halstead on a trial of Trintellix, a new generation multi-modal antidepressant, in place of Wellbutrin following this June 17, 2020, visit, which was the only change to his treatment plan at the time. (Jones Depo. 39:24-40:11, 79:17-24)

104.    Halstead returned to Jones on July 15, 2020, for medication management. (Jones Depo. 43:8-44:24)  Halstead reported doing much better on the Trintellix, feeling less depressed and irritable, and getting restorative sleep. (Jones Depo. 43:25-44:8)  In the months following, Jones saw Halstead on October 7, 2020, December 30, 2020, March 18, 2021, and in June 2021, and over the course of these visits Halstead reported his current medication regimen was generally improving his quality of life, though he still struggled with certain things such as feeling uncomfortable in busy public venues, and complained of periodic insomnia. (Jones Depo. 45:9-51:3)  Jones increased Halstead's Doxepin dosage at the December 30, 2021, visit. (Jones Depo. 48:24-49:10)

105.    Jones testified Halstead's PTSD and recurrent depressive disorder was caused by the motorcycle accident and the treatment provided to Halstead was both reasonable and necessary. (Jones Depo. 53:4-12)   Jones opined he is reasonably certain Halstead will need continued

treatment for his PTSD and recurrent depressive disorder in the future, and that such treatment will entail behavioral therapy and pharmacotherapy. (Jones Depo. 51:12-52:12) With regard to the frequency of future treatment, Jones testified every three months would be a reasonable "default" timeframe, but because PTSD can have a "vacillating course," the frequency may need to be increased with any exacerbations or provocations. (Jones Depo. 51:12-52:24, 87:13-89:4) Jones testified people with PTSD typically require long-term, if not lifelong, medication management and therapy. (Jones Depo. 112:25-115:14, 118:4-25)

106.    Jones added Abilify to Halstead's medication regimen in the fall of 2021 to help better manage Halstead's anger, depression, and mood swings. (EX. 28) According to Jones, the Abilify resulted in "significant symptomatic relief," and without it, Halstead "would likely experience an exacerbation of his mood symptoms to the detriment of his daily functioning." (EX. 28; Tr. 100:10-23)

107.    Karen Harris-Detrich's ("Harris-Detrich") is a licensed clinical social worker who works as an outpatient psychotherapist with Tricare Counseling in Dunn, North Carolina, and her testimony was also presented by video deposition. (Harris-Detrich Depo. 7:9-16, 104:5-14) Harris-Detrich first saw Halstead as a client in August 2020, though she explained he initially became a client of the practice in November 2015, when he started being seen by Aisha Alston, another counselor there. (Harris-Detrich Depo. 13:2-14:13; EX. 18: Tricare Counseling 00005)

108.    Harris-Detrich testified Halstead was diagnosed with PTSD as a result of the accident in his initial assessment prepared by Aisha Austin, and Halstead maintained this diagnosis through the time when she began treating him in August 2020. (Harris-Detrich Depo. 17:7-18:22; EX. 18: 00053) When Harris-Detrich took over Halstead's care, Halstead exhibited numerous symptoms, including feeling nervous, anxious, frightened, worried; avoiding situations that make him feel

anxious; significant problems in his sleep and difficulties with memory; severe anxiety and hypervigilance while driving; avoiding public crowds; withdrawing from his family and friends since the accident; chronic pain and feeling worried about taking care of his family; decreased engagement in activities he enjoyed, and gaining weight. (Harris-Detrich Depo. 15:5-17:1; EX. 18)  Harris-Detrich testified all of these symptoms were consistent with PTSD. (Harris-Detrich Depo. 21:21-23)

109.    When Harris-Detrich began treating Halstead on August 17, 2020, her approach was to continue the treatment plan implemented by Halstead's most recent Tricare counselors, Angela Herring and Victoria Mans. (Harris-Detrich Depo. 21:24-23:6, 30:22-32:23)  The goals of this treatment plan, which was designed to target Halstead's PTSD symptoms, included learning to decrease agitation and hyperarousal, manage chronic pain, and effectively resolve conflicts and problem solve. (Harris-Detrich Depo. 24:9-26:11)  Following her August 17, 2020, initial session with Halstead, Harris-Detrich saw him for additional sessions on September 21, September 28, November 2, November 23, December 7, 2020, February 22, 2021, and March 8, 2021, and she testified he remained symptomatic and in need of continued treatment at the end of each session. (Harris-Detrich Depo. 34:22-52:10; EX. 18)  According to Harris-Detrich, the symptoms Halstead exhibited as of his March 8, 2021, session included chronic medical problems, chronic pain, and recent life transitions and losses. (Harris-Detrich Depo. 52:13-19; EX. 18: Tricare Counseling 00061)  According to Harris-Detrich, chronic PTSD, which is characterized by a "spectrum of symptom severity," rarely goes away on its own. (Harris-Detrich Depo. 99:19-100:16)  She testified certain symptoms which Halstead endorsed, like nightmares and trouble sleeping, can remain with people for a lifetime. (Harris-Detrich Depo. 103:14-20)

110.    Harris-Detrich testified the PTSD symptoms Halstead was being treated for at Tricare were caused by the motorcycle accident, and she also testified all of the counseling and psychotherapy he received was reasonable and necessary. (Harris-Detrich Depo. 53:14-54:2)  As of her deposition on June 8, 2021, Harris-Dietrich was unable to opine on how much future treatment, if any, Halstead would likely need without seeing him again. (Harris-Detrich Depo. 52:20-53:13)  Since then, however, Harris-Dietrich saw Halstead on August 13, October 22, November 1, and November 17, 2021, and the treatment records for these sessions indicate Halstead continues to have a diagnosis of "PTSD, chronic[,] with depressed mood" and the treatment plan is for continued psychotherapy.  (EX 18; Tricare Counseling 00073, 78, 80)  At trial, Halstead testified he had numerous visits with Harris-Detrich since June 2021, and these visits have been helpful. (Tr. 97:19-99:9)

111.    Page, whose testimony was presented by video deposition, testified she anticipates Halstead needing future referrals for pain management and physical therapy on an as-needed basis. (Page Depo. 63:9-64:20, 73:8-24)  She also testified Halstead reported continued lower back pain in early 2021. (Page Depo. 63:9-64:20; EX. 9: 00392)  Page recommends Halstead continue with his home exercise program he has been given from previous physical therapy sessions. (Page Depo. 64:3-20)   Page testified she is currently prescribing Halstead Naproxen as an anti-inflammatory to treat his musculoskeletal pain in his right leg, lower back, and cervical spine, and Neurontin (i.e. Gabapentin) to treat his nerve pain in those same areas, as well as his right buttock and thigh. (Page Depo. 65:11-66:9; 66:23-68:3; 71:23-72:11)  Page monitors Halstead's kidney function through metabolic panels at least every six months to make sure the two medications are not causing kidney damage, and she testified such monitoring will need to continue into the future.

(Page Depo. 68:4-69:1; 71:21-25)  Page testified Halstead is likely to need both medications for the rest of his life. (Page Depo. 71:3-25)

112.    At trial, Halstead testified certain of his injuries gradually healed without much difficulty upon his return home to North Carolina. (Tr. 58:7-11)

113.    Halstead's dental injuries healed, with the exception of his current dietary limitations, after about two to three months and approximately 10 visits with Dr. Williams, his dentist. (Tr. 58:12-59:17)  His nasal fracture healed on its own over time. (Tr. 60:14-61:2)  His lip and chin lacerations, which were sutured closed at GSRMC, also healed uneventfully following his return home.  Halstead described the lacerations as painful for a period of time, especially when eating, but the pain eventually resolved. (Tr. 62:24-63:6)  Halstead also described some residual scarring along the left side of his upper lip and on the left side of his chin. (Tr. 63:17-64:8)

114.    Halstead's right ankle and foot were "black and blue" upon his return home from the hospital, and it was swollen to the point where he could not get a shoe on for three to four weeks. (Tr. 64:9-65:22)  This injury was very painful and limited Halstead's mobility, and he treated the injury by staying off his feet and keeping his ankle elevated and iced. (Tr. 64:9-65:22)  He considered his right ankle and foot completely healed about two to three months after the accident. (Tr. 65:20-66:1)

115.    Halstead's left ankle and foot, like his right, were extremely swollen, tender, and discolored after the accident. (Tr. 66:2-18)  He also treated his left ankle and foot with rest, elevation, and ice, and the injury gradually healed over the course of two to three months. (Tr. 66:2-18)

116.    Halstead dealt with increasing pain in his right knee after the accident. (Tr. 106:9-19)  The pain limited his mobility and made walking and driving difficult. (Tr. 106:20-107:5)  Though Dr. Parikh diagnosed him with having a meniscus tear, the injury was treated conservatively with a

steroid injection and physical therapy. (Tr. 106:14-19, 107:6-25)  Halstead testified his right knee is no longer causing him problems. (Tr. 107:14-16)

117.    Halstead also experienced increasing pain in his left knee after the accident. (Tr. 108:1-8) He described the pain as similar to what he experienced in his right knee, extremely sore and bruised, though initially not as bothersome. (Tr. 108:5-8)  It worsened over time though. (Tr. 108:9-12)  He was eventually diagnosed with having a torn meniscus in his left knee, which was surgically repaired by Dr. Boes in March 2021, but Dr. Boes did not relate the tear or surgical repair to the motorcycle accident. (Tr. 108:13-109:9)  Halstead testified he is not seeking the left knee surgery as part of his damages in this lawsuit in light of Dr. Boes' testimony. (Tr. 109:4-9)

118.    Halstead sustained abrasions to his right shoulder, back, and both arms and hands, which he treated with antibiotic ointment once he returned home. (Tr. 66:19-67:20)  The abrasions healed over the course of a couple of months but did cause modest scarring on his right hand. (Tr. 66:21-67:2)

119.    Halstead testified his right shoulder and elbow were extremely painful for several months following the accident, but the pain gradually improved over time. (Tr. 110:8-111:6)

120.    Halstead testified certain of his injuries lingered or worsened following the accident. (Tr. 67:21-68:3)

121.    The hematoma on Halstead's right hip/buttock area grew larger and became swollen in the days following the accident. (Tr. 68:4-71:21)  It eventually limited Halstead's ability to lay down comfortably or sit down at all. (Tr. 68:4-71:21)  He described the condition as "like having a tennis ball or basketball sitting back there." (Tr. 68:13-19)  He also described the hematoma as "very painful" and rated the pain as "a 10-plus" on a scale of zero to ten. (Tr. 68:25-69:3)

122.    At trial, Halstead described the extended course of treatment for his right hip, beginning with the hematoma evacuation by Dr. Hawkins-Rivers in 2015 and progressing to Dr. Lacin in 2016, and Dr. Pietak and Dr. Smith in 2017 and beyond (Tr. 69:4-71:23, 72:11-22, 72:23-79:18) Despite undergoing various treatments for his right hip and thigh injury, Halstead continues to experience right leg pain and numbness on a continual basis. (Tr. 80:4-14)  His symptoms largely depend on his level of activity, and the more active he is, the longer it takes him to recuperate. (Tr. 80:4-14)  The pain and numbness is something he has learned to live with, though it has "taken away freedoms" he previously had, such as the ability to work in his yard and maintain his property. (Tr. 80:4–82:5)  He currently manages the pain and numbness primarily with Gabapentin, which he takes four times per day. (Tr. 80:4-14)  He plans to return to Dr. Pietak in the future and seek further assistance if the situation worsens. (Tr. 80:19-81:5)

123.    Halstead experienced increasing pain and numbness in his neck and left arm, as well as his lower back, following the accident. (Tr. 82:20-83:13, 85:5-17, 88:7-22)  Halstead testified in detail about the treatment he received primarily from Dr. Bai and Dr. Boes for these problems, including the epidural steroid injections received in his cervical and lumbar spine, and the surgical repair to his left elbow. (Tr. 83:14-88:22)

124.    Halstead continues to experience neck and back pain on a daily basis and is now limited in what he can do physically. (Tr. 90:8-13, 88:23-89:8)  He is no longer able to run on the treadmill. (Tr. 89:1-24)  The pain ebbs and flows depending on his activity level. (Tr. 90:14–91:16)  He and his wife no longer hike or go on motorcycle rides, which they did previously. (Tr. 90:14–91:16) He and his wife are no longer as social as they used to be, and do not host parties at their house anymore. (Tr. 90:14-91:16)  Halstead is no longer able to cut his grass or lift weights. (Tr. 90:14-91:16)  He currently takes Naprosyn twice a day as needed to manage his neck and back pain. (Tr.

91:17-24) He plans to return to Dr. Bai to address any recurring problems with his neck or back. (Tr. 90:5-7, 251:3-16)

125.    Halstead experienced problems with his memory and ability to focus following the accident. (Tr. 91:25-93:1) He had problems remembering his work presentations, which he gave to physicians and residents on the hospital's electronic medical records system, and keeping his train of thought during conversations with them, after he returned to work in February 2016. (Tr. 91:25-93:1) He testified he would "go completely blank" at times. (Tr. 91:25-93:1) This became "humiliating" to him and was one of the reasons he ended up retiring earlier than planned. (Tr. 91:25-93:1) Halstead never had problems with his memory or maintaining his train of thought while working at Harnett Health prior to the accident. (Tr. 92:12-15, 93:20-94:1)

126.    At trial, Halstead described his struggle with mental health and psychological issues following the accident.  He testified he became anxious and depressed and was eventually diagnosed with PTSD. (Tr. 94:2-22) He described becoming more reserved than he was previously and not wanting to be in crowds of people. (Tr. 94:2-22) He lost interest in doing things, even with family, which created "hardships" within the family. (Tr. 94:2-22, 103:10-18) He also had trouble sleeping after the accident. (Tr. 95:7-24)  He would wake up between 2:00-3:00 a.m. having flashbacks and thinking about the accident, especially being ejected from his motorcycle. (Tr. 95:7-24) The flashbacks and nightmares improved with time, but Halstead still experiences them about once a month. (Tr. 95:17-24)

127.    Halstead testified he attempted to deal with his mental health issues on his own at times following the accident but was unsuccessful. (Tr. 94:23-95:6) He explained he eventually settled in with Harris-Detrich for his counseling needs and Jones for his medication management.  (Tr. 95:25-96:3)

128.    Halstead testified he plans to continue his counseling sessions with Harris-Detrich because he believes he needs the professional help after having tried unsuccessfully to manage his symptoms on his own. (Tr. 98:24-99:9, 103:5-9)  He testified at trial:  "I can't do it by myself." (Tr. 98:24-99:9)

129.    Halstead testified he intends to continue seeing Jones in the future for medication management. (Tr. 103:5-7)  Jones currently has him on Trintellix for anxiety, Abilify for mood stabilization, and Doxepin for sleep. (Tr. 99:15-18)  Halstead testified he did not take any of these medications prior to the accident, they are helpful to him, and he intends to continue taking them in the future. (Tr. 100:5-9, 101:18-102:1, 102:2-20, 03:13-20)

130.    Halstead was 60 years old when the accident occurred and 66 years old at the time of trial. (Tr. 117:19-24)  He described himself as physically fit and healthy before the accident. (Tr. 121:4-8)  He would work out at the gym four to five days a week, which he is now unable to do. (Tr. 119:15-24).  He has gained 30 to 35 pounds since the accident. (Tr. 53:3-7)  He also did his own lawn care and maintenance, including weed eating, cutting grass, digging flower beds, blowing, raking, and roof and gutter cleaning. (Tr. 120:9-22)  The Halsteads live on a one acre lot in a "heavy wooded area" that requires a lot of upkeep. (Tr. 120:9-22, 121:9-122:5)  Following the accident, Halstead hired Bass General Services to perform much of the lawn care and maintenance he previously handled. (Tr. 122:13-16)  He paid Bass General Services a total of $4,183 for their services from June 2018 through July 2021. (Tr. 122:17-123:6; EX. 23)

131.    Halstead testified his marriage has been adversely affected by the accident.  He and his wife no longer ride his motorcycle due to his pain, nor do they hike and travel like they used to. (Tr. 123:13-124:2)  Prior to the accident they would collect various antiques, old porcelain gas station signs in particular, which they no longer do because lifting them is too difficult. (Tr. 124:3-

16)  Halstead described himself as feeling like "less of a man than [he] used to be" and testified intimacy with his wife is "almost gone." (Tr. 124:20-25)  Halstead testified his sexual relationship with his wife diminished because it was too painful for him, and has not improved since the accident. (Tr. 125:2-9)

132.    At trial, Halstead provided testimony on several photographs taken in the years prior to the accident that exemplified the type of traveling and socializing he and his wife did before his injuries.  These photographs showed the two of them at the beach with family, on motorcycle trips along the Blue Ridge Parkway and Linville Falls in the mountains, on charity fundraising rides, and other leisure trips.  (EX. 26: Halstead Photos 0001-0009; Tr. 125:21-132:5)

133.    Halstead worked for Harnett Health as a clinical analyst in Betsy Johnson Hospital at the time of the accident. (Tr. 27:9-22)  His job primarily entailed training physicians and other staff members on the use of the hospital's electronic medical record software, as well as designing and redesigning programs for the software. (Tr. 156:9-20, 157:21-24) When training physicians on the medical record software, he would typically spend three days teaching them the program and then two days additional days accompanying them on their shifts and rounds, which would keep him on his feet three to four hours a day on average. (Tr. 157:25-158:6, 96:21-97:5)  He also gave a lot of presentations at work. (Tr. 27:15)  Halstead was out of work from September 14, 2015, through January 29, 2016, following the accident due to his injuries. (Tr. 132:6-16)  His annual salary was $60,000, and he presented evidence of net lost wages for this 108-day timeframe totaling $22,167. (Tr. 132:17-133:11, 163:18-20)

134.    Although Halstead initially returned to work in February 2016, he retired in August 2018, two years earlier than intended. (Tr. 134:19-22).  He retired because the physical and mental demands of the job became too much for him to handle following the accident, and he was no

longer able to perform at the level he was beforehand. (Tr. 133:17-134:22) Halstead presented evidence that the value of his net lost wages for this time period totals $104,400. (Tr. 134:19-135:12)

135.    Halstead acknowledged having previously been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in 2002 after starting a new consulting job in Florida. (Tr. 136:8-137:16) That job required him to frequently travel to different hospital facilities to implement software systems and conduct training, which became "very hectic" for him and left him feeling like he could not complete a task at one hospital before getting pulled away to another location. (Tr. 136:18-137:2) He was prescribed Concerta to help manage the frustrations, and he took the medication for nine to ten years. (Tr. 137:3-16) He stopped taking Concerta in 2010 or 2011, which was before he went to work for Harnett Health. (Tr. 137:8-25) Halstead testified he was not taking any medication for ADHD after he started working for Harnett Health in 2012 and had no difficulty concentrating or managing stress while working there prior to the accident. (Tr. 137:22-138:3)

136.    At trial, Halstead described the struggles he experienced at Harnett Health following the accident, and the struggles he had while working the consulting job in Florida, as distinctly different. With the previous consulting job, he struggled concentrating because he was constantly having to "juggle multiple facilities at a time" and deal with multiple tasks, and he was unable to complete one before having to start another. (Tr. 136:18-24, 138:4-19) At Harnett Health following the accident, he was able to focus on tasks but unable to complete them, or at least complete them in a timely manner, because his memory would basically "short circuit" and he was unable to keep up physically due to pain, which would limit his ability to make rounds with the physicians he was responsible for training. (Tr. 234:21-235:7, 136:18-24, 138:4-19)

137.    Halstead testified he participated in Harnett Health's 403(b) retirement plan while employed there. (Tr. 135:13-20).  He testified the employer match he received was three percent of his annual $60,000 salary, which totals $3,600 for the two-year time period in question. (Tr. 135:23-136:7)

138.    Halstead testified he started taking the following medications as a result of the accident: Naproxen for inflammation and pain; Gabapentin for nerve pain; Trintellix for depression and anger; Trazadone and Doxepin for sleep; and Abilify for anger and mood. (Tr. 138:23-142:23)  He did not take any of these medications prior to the accident. (Tr. 143:6-10)

139.    Halstead testified he anticipates needing to see Dr. Pietak in the future for the pain and numbness that affects his right leg and thigh; Dr. Bai in the future for his neck, shoulder and lower back pain, as well as his nerve pain on his right leg; Harris-Dietrich for his mental health issues; and Jones for his medication management. (Tr. 145:6-147:4, 251:3-16)  Although he has discussed the possibility of a spinal cord stimulator with Dr. Pietak, he intends to avoid any surgery if at all possible, even if it means he will need to live with some degree of pain. (Tr. 145:18-146:10)

140.    Halstead testified he continues to experience pain on a daily basis as a result of the accident, though some days are better than others. (Tr. 150:20-24)  The more active he is physically, the worse his pain is, and the longer it takes for it to calm down. (Tr. 150:25-151:5)

141.    At trial, Halstead provided testimony on numerous photographs taken of his injuries approximately a week after the accident.  These photographs showed abrasions and contusions to Halstead's hands, arms, right foot and ankle, shoulder and chest, the hematoma to his right thigh, and the lacerations to his lips and chin.  (EX. 26: Halstead Photos 00010-00024; Tr. 128:12-132:5)

142.    At trial, Halstead testified he incurred medical bills and expenses totaling $193,164.42 as a result of his injuries from the accident. (Tr. 113:14-116:16, 151:11-19; EX. 27)

143.    Mrs. Halstead testified at trial on behalf of her husband.  She and Halstead have been married since 2007. (Tr. 259:1)

144.    Mrs. Halstead first saw her husband in the emergency room at GSRMC on the day of the accident. (Tr. 261:17-22, 262:15-18)  She described him as "bloody all over," "bruised all over," and "really out of it." (Tr. 262:9-14)  She testified "he didn't make any sense at all." (Tr. 262:9-14)

145.    Mrs. Halstead described how she cared for her husband following their return home on September 13, 2015.  She cleaned him, fed him, and took him to his numerous medical appointments. (Tr. 263:19-264:2)  She explained how he complained about his whole body throughout his recovery, but his legs in particular. (Tr. 264:3-13)

146.    Mrs. Halstead described the physical changes she has observed in her husband since the accident.  She testified he does not stand up straight anymore. (Tr. 264:20-265:6)  Whenever they travel, which is for the most part limited to going to see Halstead's elderly mother in Virginia, they have to stop periodically for him to get out of the car and walk around because his hip "locks up" and his legs hurt. (Tr. 264:23-265:6)  She testified Halstead was in "really good shape" before the accident (Tr. 272:11-13)  She never heard Halstead complain about any pain with the exception of his left shoulder leading up to his January 2014 surgery. (Tr. 265:7-12)  She believes Halstead is getting worse, particularly in his right hip. (Tr. 265:25-266:5)

147.    Mrs. Halstead also described the psychological changes she has observed in her husband since the accident.  He has become "extremely anti-social" and no longer wants have parties and go out with their friends.  She either has to force him to do these things or go without him. (Tr. 266:8-14)  She described her husband as "tired" and "depressed." (Tr. 266:14-17)  She testified he periodically has nightmares and "whimpers in his sleep." (273:16-274:15)

148.    Mrs. Halstead testified her husband's ability to help out around the house has been adversely affected by the accident.  He can no longer climb a ladder, use a tractor, wash windows, or use shears to maintain their shrubbery. (Tr. 266:21-267:3)  She said he is limited to helping with the cooking and doing a little vacuuming. (Tr. 267:3-7)  Prior to the accident, Halstead mowed the grass, raked the yard, cleaned out gutters, cleaned the roof of the house, painted, pruned bushes and shrubs, and maintained their barns. (Tr. 267:8-21)  These tasks have been, and currently are, handled primarily by Halstead's son, Ian, or Bass General Services. (Tr. 267:22-268:7)

149.    Mrs. Halstead described how their ability to have fun together has been impacted by the accident. Beforehand, they would take periodic trips on Halstead's motorcycle, traveling to bike weekends twice a year, and take weekend trips to places like the Outer Banks and their beach house. (Tr. 268:20-269:12)  They would also frequent estate sales—an activity which Mrs. Halstead had been doing for 30 years and introduced Halstead to—but that changed after the accident because the constant standing was tough for her husband. (Tr. 268:20-269:12)

150.    Mrs. Halstead testified the accident has adversely affected their marital relationship. (Tr. 268:8-19)  She explained how she and Halstead had been married for only eight years when the accident happened, after both having been single for a long time. (Tr. 268:8-19)  During those eight years they were happy, had "a great, great life" and "went everywhere together." (Tr. 268:8-19)  She also testified they were "very intimate" and that changed after the accident because Halstead "lost interest" and "didn't feel like it anymore." (Tr. 268:8-19)  Mrs. Halstead testified they remain loving and caring toward each other, but "just don't do anything to show it as much anymore." (Tr. 268:8-19)

151.    Mrs. Halstead said her husband has had a "sadness about him" ever since the accident. (Tr. 270:5-13)  From her perspective, he no longer feels good about himself and "doesn't feel much

like a man." (Tr. 270:5-13)  She does think the counseling and therapy sessions, along with the medications, have been helpful for Halstead since the accident. (Tr. 272:23-4)

152.    Ian, Halstead's son and a Navy veteran, also testified at trial.  Ian traveled to Myrtle Beach the day following the accident and drove his father home from the hospital. (Tr. 277:5-9)

153.    At trial, Ian described how he took care of various tasks around the Halstead's house after the accident, such as landscaping work, pressure washing, gutter cleaning, and sweeping the roof. (Tr. 277:17-23) Ian characterized his father as a "changed person after the accident," both mentally and physically, and he explained how the anxiety he observed in his father no longer being able to do certain things physically "took a pretty big toll on him." (Tr. 278:11-19)  Ian continues to help out around the house about once a month. (Tr. 279:12-19)

154.    Ian testified he and his father would lift weights and work out together four to five days a week prior to the accident, but that changed afterwards, and his father no longer works out.  (Tr. 278:20-279:11)  According to Ian, before the accident his father never complained of pain while working out or skipped any workouts due to pain or injury. (Tr. 278:20-279:11)

155.    Patrick Burgess' ("Burgess") testimony was presented by video deposition.  Burgess is from Four Oaks, North Carolina, and is an E-8 Master Sergeant with the North Carolina Army National Guard. (Burgess Depo. 10:1-5, 10:10-12:12)  He is friends with Halstead and was among the group of riders traveling home to North Carolina at the time of the accident. (Burgess Depo. 8:20-9:8, 15:14-23)  Burgess got to know Halstead through riding motorcycles together. (Burgess Depo. 8:20-9:8)

156.    Burgess testified about the severity of the collision between Halstead's motorcycle and Cole's car.  He explained that he and the other nine riders were travelling on Highway 701 North at approximately 55 m.p.h. when Cole's vehicle unexpectedly entered the roadway in the middle

of the group. (Burgess Depo. 20:18-21:6)  He described the collision as an "explosion" and likened it to the world coming to an end at that point in time. (Burgess Depo. 20:18-21:6)  Burgess was traveling behind Halstead and described how Halstead was the first person to collide with Cole's car. (Burgess Depo. 25:6-11)  Halstead struck Cole's car in the front left portion, which caused the car to start spinning. (Burgess Depo. 25:6-23)  Then, Joffrion's motorcycle struck the car's back right quarter panel. (Burgess Depo. 25:6-23)  Burgess testified Halstead was ejected from his motorcycle upon impact with Cole's car. (Burgess Depo. 26:13-23)  He described Halstead as shooting up into the air and then hitting the ground and rolling. (Burgess Depo. 26:13-23)  After Burgess brought his motorcycle to a stop, he noticed Halstead laying on the ground with his teeth knocked out. (Burgess Depo. 26:13-23)

157.    Burgess described the changes he observed in Halstead following the accident. Beforehand, they would ride motorcycles together on a regular basis, go out to eat and have cookouts with friends, and go to the beach with their wives. (Burgess Depo. 42:23-44:24)  Burgess described Halstead as "real active" prior to the accident and even commented that he was a bit jealous of Halstead's dedication to working out on a regular basis. (Burgess Depo. 44:25-45:10)

158.    Burgess described Halstead as having a good sense of humor, "happy-go-lucky," and "a pleasure to be around" before the accident.  (Burgess Depo. 45:11-18)  That changed afterwards. Burgess also noticed changes in Halstead's ability to get around physically and described him as now having permanent hip damage. (Burgess Depo. 45:19-46:22)  He testified Halstead struggles to climb stairs, is unable to climb a ladder, or mow his grass. (Burgess Depo. 45:19-46:22)  He said Halstead has been unable to use his tractor since the accident. (Burgess Depo. 47:1-15)  He testified the biggest change he noticed in Halstead is his depression, which he noticed through decreased motivation, a more subdued personality, and a "doom and gloom" outlook on life.

(Burgess Depo. 45:19-46:22, 48:5-49:2)  Burgess also testified Halstead had to quit his job because of the physical and mental struggles he was dealing with after the collision. (Burgess Depo. 45:19-46:22)

159.    Phillip Jackson ("Phillip") is a friend and former co-worker of Halstead's, and his testimony was presented by video deposition. (Phillip Depo. 25:20-26:1)  Phillip currently works as a clinical analyst for Harnett Health in Betsy Johnson Hospital's IT department. (Phillip Depo. 7:8-21)  He met Halstead when Halstead started working at the hospital, and they were both clinical analysts and shared an office together and had similar job duties. (Phillip Depo. 9:8-15, 10:18-24, 33:2-4)  Phillip described Halstead as a hard-working, dependable co-worker who never missed work prior to the accident. (Phillip Depo. 13:12-23)  He explained that Halstead had a strong work ethic and would stay on task to do a job until the job was complete. (Phillip Depo. 14:9-17)  He described Halstead as "very charismatic" and "happy" and "always there to help whoever needed help."  (Phillip Depo. 13:12-23, 15:8-17)  Phillip said Halstead did not stress about things, went with the flow and made things happen, and did his job and was happy about it. (Phillip Depo. 47:14-25)  Furthermore, Phillip never heard Halstead complain of any pain or discomfort at work, and he testified Halstead never struggled to complete his work assignments. (Phillip Depo. 15:18-25, 19:3-19)  Phillip never heard Halstead express any desire to retire early prior to the accident. (Phillip Depo. 16:1-8)

160.    Phillip testified he observed various changes in Halstead after the accident.  He described him as "not the same Harry Halstead I knew before." (Phillip Depo. 17:16-20)  Halstead became "short" with people and "withdrawn." (Phillip Depo. 16:14-23)  He testified Halstead could not sit still and would often complain of pain in his hip. (Phillip Depo. 16:24-17:8)  Halstead would mention he was having difficulty sleeping and would wake up during the night having flashbacks

to the accident. (Phillip Depo. 17:9-20)  Phillip testified Halstead complained specifically of pain in his shoulder, hip, and knee once he returned to work following the accident, and would often try to prop his foot in different positions on his desk to relieve pressure on his hip and knee. (Phillip Depo. 18:16-19:2)    Phillip, who is also a registered nurse with emergency room experience, characterized Halstead as seeming "miserable" once he returned to work after the accident. (Phillip Depo. 19:3-19, 37:7-38:1, 48:19-49:10)  He testified Halstead would try standing to alleviate his pain and find comfort while working, but his hip and knee, in particular, would still continue to bother him. (Phillip Depo. 37:7-38:1)

161.    With respect to job performance, Phillip testified Halstead could not perform tasks like he did before the accident. (Phillip Depo. 19:20-20:11)  He explained how the hospital had a lot of "very needy" physicians who lacked computer savvy and required frequent IT help, and after the accident Halstead would often ask Phillip to cover his duties because he was mentally and physically unable to do so. (Phillip Depo. 19:20-20:11, 39:3-12)  Additionally, when Halstead would teach interactive classes to physicians after the accident, Halstead was withdrawn and just "going through the motions." (Phillip Depo. 48:1-12)  Phillip also described Halstead as having a noticeable limp once he returned to work after the accident. (Phillip Depo. 39:13-20)

162.    Phillip said Halstead informed him of his decision to retire early and explained it was because he could no longer do the job mentally. (Phillip Depo. 20:12-18)  Phillip testified he did not think Halstead would have retired early had it not been for the accident and the physical and psychological problems it caused him. (Phillip Depo. 20:24-21:10)

163.    Phillip testified Halstead and he remain friends, though they no longer see each other as often. (Phillip Depo. 21:14-22:8)  He explained Halstead no longer wants to do things like he did before the accident and pointed to Halstead's lack of working in his yard as an example.  Phillip

pointed out Halstead "always kept a pristine yard" before the accident. (Phillip Depo. 22:9-23:10) Phillip also testified Halstead worked out on a regular basis prior to the accident but no longer did so afterwards. (Phillip Depo. 51:23-54:6, 59:5-60:22)

164.     Charlene Bell ("Bell") is the application manager in the Information Systems Department at Harnett Health and works in Betsy Johnson Hospital, and her testimony was presented by video deposition.    (Bell Depo. 7:14-15, 8:21-24, 9:24-10:5)  Bell worked as a clinical analyst with Halstead at the time of his hire in 2012 and became his supervisor in 2013. (Bell Depo. 10:19-24) Bell described Halstead as "good at what he did" prior to the accident and someone with a good attitude who "accepted challenges." (Bell Depo. 14:16-15:23)  She explained how he was  "very good working with the physicians," some of whom could become agitated when they encountered problems with the software system. (Bell Depo. 14:16-15:23) She also testified Halstead was a "team player" and supportive of the organization's mission. (Bell Depo. 17:7-23)   If another clinical analyst needed coverage on the call schedule, Halstead was routinely willing to volunteer to cover the shift. (Bell Depo. 17:7-23)  Bell testified Halstead was very active physically prior to the accident, pointing out he would go to the gym on a regular basis at the end of the workday. (Bell Depo. 18:13-19:7)  She never heard Halstead complain of any aches or pains while at work prior to the accident, nor did she observe any mental or psychological problems with him prior to the accident. (Bell Depo. 18:13-19:7)  Prior to the accident, Halstead did not struggle to complete assignments and worked independently. (Bell Depo. 19:8-16)

165.     Bell observed various changes in Halstead once he returned to work following the accident. (Bell Depo. 19:23-22:1)  Halstead initially returned to work on a part-time basis and gradually returned to full-time in mid-February 2016. (Bell Depo. 24:11-25)  Bell testified Halstead looked like he was in pain when he walked and had difficulty sitting for long periods of time. (Bell Depo.

25:21-26:3)  She explained how "he really wasn't the same person" and seemed "anxious" and "not as confident as he was before." (Bell Depo. 19:23-22:1)  She testified Halstead had difficulty focusing on tasks and remembering things, and would make mistakes when performing routine tasks he had previously done "hundreds of times before," like setting up a new user. (Bell Depo. 19:23-22:1)  She described Halstead as "scatterbrained" after the accident and less tolerant of stressful situations. (Bell Depo. 19:23-22:21, 26:8-15)  Halstead was able to do his job after the accident but not as well as before. (Bell Depo. 43:17-22)  She also observed a more negative attitude. (Bell Depo. 26:16-27:13)  On one occasion, eight weeks or so after returning to work on a full-time basis, Halstead came to Bell and told her he was struggling, and she described him as having really dark circles and bags under his eyes. (Bell Depo. 19:23-22:1)  Halstead informed her during this meeting he was having nightmares about the accident on a nightly basis and trouble sleeping. (Bell Depo. 19:23-22:1)  He also told her about the physical pain he was dealing with, specifically in his buttock and hip area, as well as in his shoulder, and also explained how he was fearful and anxious all the time. (Bell Depo. 19:23-22:1, 22:15-23:6)  Bell testified she encouraged Halstead to seek counseling, either through Harnett Health's employee assistance program or privately, which Halstead did. (Bell Depo. 19:23-22:1)  Halstead did not mention the possibility of retiring early during this meeting, only that he needed some help. (Bell Depo. 25:5-16)

166.    Bell testified Halstead approached her in April 2018 and told her the stress at work was more than he could handle, and he felt like he needed to retire. (Bell Depo. 28:3-13)  He retired in August 2018. (Bell Depo. 28:3-5)  She testified Halstead had no complaints or problems managing the stress of his job prior to the accident, nor did she believe any of his post-accident struggles at work were due to increased workplace stress, as opposed to the injuries he suffered in the accident. (Bell Depo. 28:14-17, 53:20-55:18)  According to Bell, Halstead was "like a shadow of the person

he was, the man he was" prior to the accident, and at times she would notice a "haunted look" on his face and knew there was something going on with him that was not related to his job. (Bell Depo. 55:6-18)  Bell testified she did not believe Halstead would have retired early had it not been for the motorcycle accident. (Bell Depo. 56:22-57:2)

167.    Dr. Jesse A. Raley ("Dr. Raley") is a practicing psychiatrist in Columbia, South Carolina, who is board certified in general psychiatry, child and adolescent psychiatry, and forensic psychiatry. (Tr. 606:16-18; 607:22-608:2)  He was retained on behalf of Halstead to perform a forensic evaluation of him to evaluate the emotional and mental damages he experienced from the motorcycle accident. (Tr. 613:13-17)

168.    Dr. Raley testified Halstead was mentally and emotionally impacted by the accident in a variety of ways, which became manifest through symptoms of flashbacks, nightmares, intrusive thoughts, significant symptoms associated with excessive guilt, symptoms related to depressed mood and anxiety, symptoms of irritability, symptoms of hypervigilance with feelings of having a lack of safety, worsened concentration, impaired sleep, muscle tension, and restlessness. (Tr. 613:17-614:4)  Dr. Raley acknowledged Halstead had a prior history of ADHD, which impacted his concentration and was managed previously through a stimulant medication, and he opined the accident worsened this condition. (Tr. 614:5-14)

169.    As part of his forensic evaluation, Dr. Raley also recommended treatment for Halstead to pursue to address his symptoms. (Tr. 614:15-615:3)  The recommended treatment included individual psychotherapy to help Halstead cope with the events of the accident itself, in addition to the impairments associated with the resulting physical disabilities he was experiencing; seeing a psychiatrist to come up with appropriate medications to help manage his condition; and couples counseling to help Halstead, as well as his wife, deal with the impact the accident was having on

their marital relationship. (Tr. 615:18-616:12) Dr. Raley also opined Halstead will benefit from continued mental health treatment as he moves forward with his life. (Tr. 632:13-18; 636:11-15)

170.     Lindsay Moore ("Moore") is a physician's assistant and certified life care planner and was retained on behalf of Halstead as an expert witness to prepare a life care plan and medical cost projection for his future medical treatment needs. (Tr. 670:24-671:12) In preparing her plan, Moore reviewed medical records and depositions, interviewed Halstead and his wife, and communicated with Halstead's treating providers, Page, Dr. Boes, Dr. Bai, and Jones. (Tr. 674:20-675:14, 676:20-677:18) Moore explained the purpose of speaking with Halstead's medical providers was to understand what future treatments would be reasonably necessary to treat his symptoms and keep him at a functional level to the best of his ability, and she also testified she had a follow-up conversation with Jones more recently to confirm the recent addition of Abilify to Halstead's medication regimen was related to his injuries and symptoms from the motorcycle accident. (Tr. 677:14-680:16; EX. 28) Moore also had Page, Dr. Bai, and Jones document their recommendations for Halstead's future treatment needs for purposes of her life care plan. (Tr. 678:13-679:6, 679:7-15, 679:16-680:16; EX. 28)

171.     Moore's life care plan and cost projection that Halstead has asked this Court to award contains the following treatments: a physical therapy evaluation once every three years; a one-time occupational therapy evaluation; an acupuncture trial two to three times; physical therapy visits two times a week every three years; occupational therapy visits on an as-needed basis; counseling sessions on an as-needed basis (but assumed to be six to twelve times a year for three years, then twice a year for the rest of his life); venipuncture twice a year; a complete metabolic panel (to evaluate medication toxicity) and a basic metabolic panel once a year; cervical or lumbar x-rays on an as-needed basis; orthopedic and physiatry office visits once a year; primary care office visits

once every six months or on an as-needed basis; psychiatry office visits once every three months; cervical epidural transforaminal steroid injections (particularly at the C4-5 and C6-7 locations) 10 to 15 times over the course of his life; S1 epidural transforaminal steroid injections 10 to 15 times over the course of his life; a TENS unit and related accessories; and a lumbar brace. (EX. 28; Tr. 678:1-684:9, 684:14-685:7, 685:8-686:22, 689:7-691:9)   Moore testified the acupuncture was recommended by Dr. Bai, and the annual metabolic panels were recommended by Page specifically to monitor the various medications Halstead takes for his accident-related injuries. (Tr. 697:20-698:2, 698:3-18; EX. 28)   Moore testified the Oxycodone was included in the plan upon the recommendation of Dr. Bai for management of periodic pain flare ups. (Tr. 706:9-19; EX. 28) The specific medication prescriptions on the plan are Trintellix once a month; Doxepin once a month; Abilify once a month; Naprosyn twice a year; Gabapentin once a month; and Oxycodone twice a year. (EX. 28; Tr. 692:1-693:8, 706:9-18)   Moore testified she relied on GoodRX, which is geographic region specific, to determine the costs for Halstead's medications, and she further testified that utilizing retail costing is consistent with sound life care planning methodology. (Tr. 703:1-10)

172.    Moore used the life expectancy chart formulated by the Centers for Disease Control and Prevention ("CDC") to calculate the projected future medical costs as opposed to the life expectancy tables in the South Carolina Code of Laws. (Tr. 696:17-697:19; EX. 24)   This approach/methodology was utilized in a similar USPS accident case by the plaintiff, and accepted by the court. *See Crimmins v. United States*, C/A No. 2:17-cv-3470-DCN, ECF 65 at ¶¶ 70–73 (Plaintiff's certified life care planner, Lindsay Moore, used the life expectancy chart formulated by the CDC to calculate projected future medical costs, and plaintiff's CPA, Tricia Yount, used

the life expectancy tables codified in S.C. Code § 19-1-150 to calculate the present value of projected future medical costs based on Lindsay Moore's life care plan.).

173.    Should Halstead receive all the medical treatments contained in Moore's life care plan, the projected future costs range from $327,132.04 to $435,526.31. (EX. 28)  Moore explained the range of her costs is to account for the range of costs in a community, and the fact that products can have different price points depending on where they are bought and sold. (Tr. 691:15-25)  She further explained the lifetime cost she comes up with takes into account not only the range in cost of a specific item, but also the frequency of an item's need over a person's lifetime. (Tr. 691:15-25)

174.    Mark Bokesch ("Bokesch") is a CPA who was retained by Halstead to calculate his economic damages, specifically the value of his pre-trial lost wages and early retirement, his future medical costs, and lost household services. (Tr. 728:20-729:16)

175.    Bokesch calculated the value of Halstead's lost wages for the 108 days missed from work from September 14, 2015, through January 29, 2016, based on data received from Harnett Health's human resources department. (Tr. 739:22-25; EX. 22)  He determined the gross value of this damage to be $25,479, which reduced to a net value of $22,167, once adjusted for income taxes. (EX. 29; Tr. 740:10-18)

176.    Bokesch calculated the value of Halstead's lost earnings for the two years of work he missed due to early retirement based on Halstead's $60,000 annual salary at the time of his retirement. (EX. 29; Tr. 739:12-21)  He determined the gross value of Halstead's earnings for this timeframe to be $120,000, which reduced to a net value of $104,400, once adjusted for income taxes. (EX. 29; Tr. 740:10-18, 741:10-12)

177.    Bokesch calculated the value of Halstead's lost employer match contribution for his retirement account to be $3,600 for the two years of work he missed due to early retirement. (EX. 29; Tr. 740:1-5)  He based this calculation on the 3% Halstead was contributing to the account from his annual salary at the time he stopped working. (Tr. 740:1-5)

178.    Bokesch calculated the present value of Halstead's future medical costs based on Moore's life care plan. (Tr. 729:17-21)  To do so, he applied a growth/inflation rate based on the 10-year average of the Consumer Price Index numbers to the services and items in the plan, and projected those costs into the future according to Halstead's life expectancy. (Tr. 730:2-7, 744:7-20)  He then calculated the present value cost of the plan using the 10-year U.S. Treasury bond rate. (Tr. 730:8-10)  Based on this methodology, Bokesch determined the high end present value for Halstead's future medical care costs to be $459,577, and the low end value to be $343,350. (ECF 126; EX. 29; Tr. 820:13-22)  Bokesch used a life expectancy of 16 years for Halstead pursuant to the S.C. Code §19-1-150. (Tr. 738:21-22, 747:7-748:10, 821:22-822:1)

179.    Bokesch calculated the value of Halstead's lost household services by gathering information from him about the type of services he performed around the house prior to the accident. (Tr. 735:20-736:5)  To gather this information, he had Halstead complete a questionnaire detailing the type of services performed and time spent doing so, and he also spoke with Halstead on the phone about the information provided. (Tr. 735:20-736:8)  Bokesch testified that, based on the information provided, Halstead performed an average of 23.9 hours of weekly household services prior to the accident, and an average of 16.25 hours afterwards.  (Tr. 736:9-24)  He valued the lost household services at a rate of $14.91 an hour, the rate applicable to Fayetteville, North Carolina, provided for by the United States Bureau of Labor Statistic's "Dollar Value of Day" data, which yielded an annualized loss of $7,698 per year. (Tr. 737:13-23)  Based on these figures,

Bokesch calculated Halstead's pre-trial loss of household services to be $48,497. (Tr. 738:4-7)  To calculate the value of Halstead's lost future household services, Bokesch carried the $7,698 annual value out over Halstead's 16-year life expectancy, and then applied a discount rate of 1.99 percent, which was based on the current 20-year U.S. Treasury bond rate, to arrive at a present value of $105,435. (Tr. 738:16-739:3)   Bokesch testified the total value of Halstead's lost household service, pre-trial and future, totaled $153,932. (Tr. 738:16-739:3; EX. 29)

180.    Dr. Barry Levin ("Dr. Levin") is a neurologist employed with Emerson Hospital in Concord, Massachusetts, and he testified by video deposition as an expert for the government in the field of neurologic medicine. (Levin Depo. 12:5-9)

181.    Dr. Levin never evaluated Halstead as a patient or performed an independent medical examination of him. (Levin Depo. 79:20-24; 141:10-18)  He formulated opinions in the case based on his review of the certain medical records and depositions provided to him by the government. (Levin Depo. 85:5-9, 141:19-142:3)

182.    Dr. Levin acknowledged the collision at issue was a "high kinetic and traumatic event." (Levin Depo. 92:6-8)  He testified the crash was the type of traumatic event that can cause a pre-existing condition, such as cervical spondylosis, to become symptomatic, and could have caused Halstead's pre-existing spondylosis to worsen. (Levin Depo. 104:6-11, 110:11-22)   He acknowledged Halstead's body was already in a compromised state physically simply due to age and normal wear and tear at the time of the accident. (Levin Depo. 142:8-12)

183.    Dr. Levin testified Halstead received a CT scan of his cervical spine at GSRMC due to complaints of neck pain following the accident. (Levin Depo. 88:23-89:18, 97:7-14)  He further acknowledged Halstead likely struck his left elbow, left shoulder, and left wrist on the roadway when he landed on the ground after being ejected from his motorcycle. (Levin Depo. 91:1-9)

184.    Dr. Levin testified Halstead complained of left elbow pain during his visit to Dunn Medical Services on October 13, 2015. (Levin Depo. 103:15-104:5; EX. 9: Dunn Medical Services 00038) He further testified Halstead subsequently complained of left elbow pain as well as neck pain during his visit to Dunn Medical Services on November 12, 2015. (Levin Depo. 99:5-18; EX. 9: Dunn Medical Services 00032)  He testified Halstead had imaging studies performed to both parts of his body on November 12, 2015, following those complaints. (Levin Depo. 100:10-101:7)  Dr. Levin was not aware of any intervening trauma experienced by Halstead that might have caused or contributed to Halstead's neck and elbow pain. (Levin Depo. 101:9-19)

185.    Dr. Levin offered the following opinions regarding Halstead's post-accident condition:  (1) Halstead had a right posterior cutaneous nerve of the thigh traumatic neuropathy due to a large hematoma, which was related to his motor vehicle accident; (2) there was no definite evidence to support lumbosacral radiculopathy or lumbosacral plexopathy in the right lower extremity; (3) there was no objective evidence of ulnar neuropathy due to trauma from the motor vehicle accident; (4) there was not objective evidence of specific cervical nerve root injury associated with the motor vehicle accident; and (5) there is was no evidence to support left lower extremity lumbosacral radiculopathy due to the motor vehicle accident.  Halstead had a pre-existing chronic condition involving back pain. (Levin Depo. 15:22-16:12)

186.    Dr. Levin testified his opinion concerning Halstead's right posterior cutaneous thigh nerve neuropathy was based upon the assessments and findings of Dr. Pietak and Dr. Peterson of Duke Neurology, as well as the findings and assessment of Dr. Smith of Duke Spine. (Levin Depo. 26:17-35:14; EX. 7: Duke Neurology 00003; EX. 8: Duke Spine 00006-00007)

187.    Dr. Levin testified his opinion concerning Halstead's ulnar neuropathy was based on his belief that Dr. Bai, who concluded Halstead had a left ulnar neuropathy and chronic cervical

radiculopathy based on the July 8, 2019, EMG study of Halstead's left upper extremity, misinterpreted the EMG study findings. (Levin Depo. 42:14-46:21)  According to Dr. Levin, the EMG study findings showed Halstead "possibly" had an ulnar neuropathy and cervical radiculopathy, not definitively. (Levin Depo. 46:11-21)  Dr. Levin testified the cause of Halstead's ulnar neuropathy, based on the EMG study, was "unclear." (Levin Depo. 48:7-9)  Dr. Levin was aware of no evidence indicating Halstead was experiencing any numbness or tingling in the fourth and fifth digits of his left hand in 2015 prior to the motorcycle accident. (Levin Depo. 135:24-137:8)  Dr. Levin was aware of Dr. Boes' opinion that Halstead's left ulnar neuropathy and transposition surgery resulted from, and were necessitated by, the motorcycle accident, but he disagreed with Dr. Boes. (Levin Depo. 137:13-24)  Dr. Levin testified he did not know what caused Halstead's ulnar neuropathy. (Levin Depo. 138:1-9)

188.    Dr. Levin testified his opinion concerning Halstead's lack of a cervical nerve root injury being caused by the accident was based on his belief that Halstead had pre-existing cervical spondylosis and radiculopathy, and he did not find any evidence the accident made the condition worse. (Levin Depo. 62:16-24)

189.    Dr. Levin testified his opinion concerning Halstead's lack of left lower extremity lumbosacral radiculopathy due to the motor vehicle accident was based on the fact Halstead had pre-existing chronic back pain, as shown by documentation of previous changes at the L5-S1 level. (Levin Depo. 63:6-10)  He testified he found no evidence the accident exacerbated the pre-existing condition, and he further testified there was no indication for Halstead to have any cervical epidural steroid injections for his symptoms following the accident. (Levin Depo. 67:10-12, 69:2-12)

190.    Dr. Levin testified Halstead did suffer a traumatic brain injury as a result of the accident. (Levin Depo. 81:14-17, 111:3-7)  He further acknowledged the injury, which he characterized as

"minimal," left Halstead at an increased risk of brain injury in the future, at least in the short term. (Levin Depo. 112:4-7)

191.    Dr. Levin testified Halstead's right hip hematoma was caused by the motorcycle accident and resulted in a nerve injury. (Levin Depo. 117:16-118:3)  He opined the nerve injured was the posterior cutaneous nerve of the thigh, which is part of the sciatic nerve. (Levin Depo. 125:23-126:17)  He described the posterior cutaneous nerve as a sensory nerve that innervates the inferior and lateral portion of the buttock, a portion of the scrotum, the posterior aspect of the right thigh, and some of the area of the posterior leg just beyond the knee. (Levin Depo. 127:25-128:12)  He testified Halstead will need future treatment for the nerve injury, potentially for the rest of his life. (Levin Depo. 138:12-21)  Dr. Levin did not criticize Halstead's management of his nerve pain with Gabapentin. (Levin Depo. 138:22-139:3)

192.    Dr. Levin testified Halstead had pre-existing cervical spondylosis at the time of the accident, and he acknowledged spondylosis is not uncommon in people in their 60's. (Levin Depo. 94:4-9, 95:4-20)  He testified cervical spondylosis is a condition that can be made symptomatic from a traumatic event like a motorcycle accident, and he could not identify any evidence that Halstead's cervical spondylosis was symptomatic prior to the accident. (Levin Depo. 96:12-97:2) Dr. Levin could not identify any evidence that Halstead was experiencing pain in his neck in the days or months preceding the accident on September 12, 2015. (Levin Depo. 92:15-93:12)  Dr. Levin could not identify any evidence more recent than the 1990's to indicate Halstead experienced neck pain prior to the date of the accident. (Levin Depo. 93:13-94:12)

193.    Dr. Levin was aware that Dr. Bai, during the 2019-2020 timeframe, diagnosed Halstead with cervical radiculopathy, paresthesia of his skin, lumbar radiculopathy, left ulnar nerve lesion, and chronic pain and treated these conditions with steroid injections. (Levin Depo. 114:3-116:1;

EX. 6: Carolina Spine Center 00031)  He was also aware of Dr. Bai's opinion that all of these conditions were related to the motorcycle accident, but he disagreed with that assessment. (Levin Depo. 114:3-117:15; EX. 6: Carolina Spine Center 00031)

194.    Yount is a forensic accountant who was retained by the government to evaluate the potential financial loss to Halstead as a result of the motorcycle accident, the value of his future medical expenses and household services in particular. (Tr. 579:13-15, 583:12-10)  Yount relied upon the life care plan prepared by Reavis, the government's life care planning expert who did not testify at trial, to calculate Halstead's future medical care. (Tr. 584:16-21)  Based on Reavis' plan, Yount determined the present value of Halstead's future medical care to be $425,831. (Tr. 585:22-25; EX. 38)  Yount relied upon data included in the report of Halstead's economic expert, Bokesch, to calculate the value of Halstead's lost household services, though in contrast to Bokesch, she used an hourly rate value of $10.89 for the Fayetteville, North Carolina, area for the year 2015, and then adjusted that value for inflation over the course of a "full-function" life expectancy. (Tr. 586:1-17)  Through this approach, Yount calculated the value of Halstead's lost household services to be $140,397. (EX. 38)  Yount testified the combined value of Halstead's future medical expenses and household service was $566,228. (Tr. 586:18-24, EX. 38)  Yount testified she did not take issue with the lost pre-trial wages or 403(b) employer match as calculated by Bokesch. (Tr. 591:20-592:6)

195.    Dr. Wilfred Hynes ("Dr. Hynes") testified as an expert for the government in the field of pain management. (Tr. 833:2-9)  Dr. Hynes is an anesthesiologist employed with Tufts Medical Center in Boston, Massachusetts. (Tr. 828:22-23, 829:23-25)  Dr. Hynes was hired by the government to review Halstead's medical records. (Tr. 831:5-8)  Dr. Hynes never interviewed

Halstead, treated him as a patient, or performed an independent medical examination on him. (Tr. 834:1-11)

196.   Dr. Hynes testified Halstead's right leg hematoma was likely caused by compressive irritation of Halstead's sciatic nerve after the accident. (Tr. 836:4-9)  He further testified that once the hematoma was evacuated, Halstead continued having pain in his right leg consistent with compressive irritation of the nerve. (Tr. 836:9-10)  He testified Halstead subsequently underwent a S1 nerve root injection, which seemed to improve his symptoms, and also started taking Neurontin, which also seemed to help his symptoms and keep them "fairly well controlled." (Tr. 836:10-19)  Dr. Hynes acknowledged Halstead still complains of pain in his right leg. (Tr. 837:1-3)

197.   With respect to the steroid injections Halstead received from Dr. Bai and Dr. Smith, Dr. Hynes testified Halstead did not respond to the left-sided cervical nerve root injection, but he did respond, though temporarily, to the right-sided injection. (Tr. 845:16-846:4)  Dr. Hynes also acknowledged Halstead responded well to the S1 nerve root injection for his hematoma symptoms. (Tr. 845:16-846:4)

198.   Dr. Hynes testified there is no type of imaging study—MRI, EMG, or otherwise—capable of determining if a patient has pain. (Tr. 844:3-7, 848:10-19)  He acknowledged the neck pain Halstead experienced after the accident could have been caused by the accident. (Tr. 849:4-14)  Dr. Hynes testified Halstead experienced both acute and chronic pain as a result of the accident and will continue to experience chronic pain in the future. (Tr. 854:22-855:6)  Dr. Hynes acknowledged chronic pain can change the way people live, can be isolating, can make people not want to be social or get out in public, can cause depression and anxiety, and can cause a person to become less active and impact their well-being. (Tr. 856:10-857:2)

199.    Dr. Richard Friedman ("Dr. Friedman") testified as an expert for the government in the field of orthopedic medicine and orthopedic surgery. (Tr. 881:10-17)   Dr. Friedman is an orthopedic surgeon employed with the Medical University of South Carolina.  (Tr. 877:24-878:5) He was hired by the government to review Halstead's medical records and case depositions. (Tr. 880:13-881:9)  Dr. Friedman never interviewed Halstead, treated him as a patient, or performed an independent medical examination on him. (Tr. 883:17-20)

200.    Dr. Friedman testified the accident was severe, and Halstead, who was thrown from his motorcycle approximately 30 feet before landing on the ground, was very fortunate to have survived. (Tr. 883:5-10, 884:5-7)

201.    Dr. Friedman testified Halstead undoubtedly has chronic pain in his right leg. (Tr. 885:8-15, 886:8-10)  Dr. Friedman could not explain where Halstead's right leg pain was coming from, but he acknowledged Halstead had consistently complained of pain in his right leg ever since the accident, and the pain remained ongoing in 2019 when he began seeing Dr. Boes and Dr. Bai. (Tr. 889:21-890:5)

202.    Dr. Friedman testified steroid injections can be performed for both diagnostic purposes and therapeutic purposes. (Tr. 887:1-4)  He further testified the steroid injections given to Halstead, in his lumbar region as well as his cervical region, provided him only short-term relief from his radicular symptoms. (Tr. 887:20-25, 890:18-25)  Dr. Friedman testified he did "not have an issue" with Dr. Bai trying steroid injections on Halstead. (Tr. 907:2-5, 908:13-22)

203.    Dr. Friedman agreed Halstead suffered cervical pain as a result of the motorcycle accident, though he was not sure of its cause. (Tr. 909:1-13)

204.    Dr. Friedman opined Halstead did not sustain any cervical radiculopathy or any residual surgical radiculopathy pain as a result of the accident, and he based this opinion on the June 29,

2019, EMG nerve conduction study of Halstead's left upper extremity, which he testified did show evidence of ulnar nerve compression in the left elbow, but did not show cervical radiculopathy. (Tr. 888:11-22)  He testified if Halstead had a cervical radiculopathy, an EMG study would show it. (Tr. 890:6-14)  Dr. Friedman acknowledged his opinion on the cause of Halstead's neck pain differed from the opinion of Dr. Bai, who diagnosed Halstead with cervical radiculopathy. (Tr. 907:6-908:12)

205.    Dr. Friedman opined the cubital tunnel syndrome in Halstead's left elbow, which was surgically repaired by Dr. Boes in October 2019, was not related in any way to the motorcycle accident.   (Tr. 891:24-892:1)   He testified the basis for his opinion was that Halstead had documented symptoms of cubital tunnel syndrome prior to the accident, had no complaints of cubital tunnel syndrome at the time of his EMG study in 2019, and had no documentation of any physical findings of cubital tunnel syndrome. (Tr. 892:2-11)  Dr. Friedman testified a traumatic event such as a motor vehicle accident can cause cubital tunnel syndrome but would produce physical findings and symptoms in the patient immediately afterwards, not years later. (Tr. 892:12-21)  Dr. Friedman acknowledged his opinion on the cause of Halstead's left cubital tunnel syndrome  differed from the opinion of Dr. Boes, who performed the cubital tunnel transposition surgery in October 2019. (Tr. 905:11-906:11)  Dr. Friedman could not testify Dr. Boes was wrong in his diagnosis and treatment of Halstead's left cubital tunnel syndrome; rather, he simply testified he was offering his differing opinion based on this review of the records. (Tr. 905:21-906:14)

206.    Dr. Friedman testified Halstead did injure his left and right knees as a result of the motorcycle accident; however, he opined that no long-term injury was suffered to either. (Tr. 912:18-916:16)  Dr. Friedman was aware Dr. Parikh diagnosed Halstead with a medial collateral

ligament ("MCL") sprain and meniscus tear in this right knee following the accident, but he disagreed with Dr. Parikh's opinion. (Tr. 912:18-918:5)

## II.     CONCLUSIONS OF LAW

### A. Jurisdiction, Venue & Applicable Law

1.     The United States is the proper defendant in this action pursuant to the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671–2680. Cole was operating a motor vehicle within the course and scope of her federal employment with the USPS at the time of the accident on September 12, 2015. *See* 28 U.S.C. § 2679(b)(1).

2.     Pursuant to 28 U.S.C. § 1391(b)(2) and Local Civil Rule 3.01(A)(1) (D.S.C.), venue is proper in this Court because a substantial part of the events or omissions giving rise to Halstead's claims occurred in the Florence Division of the United States District Court for the District of South Carolina.

3.     Plaintiff filed his complaint on December 20, 2018, and has satisfied the administrative requirements of the FTCA.

4.     The FTCA imposes tort liability on the United States only "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and only to the extent that "a private person[ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* § 1346(b)(1). The FTCA is a limited waiver of sovereign immunity, and therefore courts must strictly interpret and apply it. *United States v. Sherwood*, 312 U.S. 584, 590 (1941); *Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990).

5.     Under the FTCA, procedural matters are governed by federal law; however, the FTCA directs courts to examine substantive legal issues pursuant to the laws of the place where the act

or omission occurred.  *Miller v. United States*, 932 F.2d 301, 303 (4th Cir.1991) ("A plaintiff has a[] FTCA cause of action against the government only if [he] would also have a cause of action under state law against a private person in like circumstances.  State law determines whether there is an underlying cause of action . . . ."); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 757 (4th Cir.1990) ("United States liability under the FTCA depends upon state law.").  Here, Halstead alleges Cole acted negligently while driving in Horry County. Therefore, South Carolina law, including that regarding negligence actions, controls.  *See* 28 U.S.C. § 1346(b)(1).

6.      To establish a cause of action in negligence, three essential elements must be proven: (1) a duty of care owed by the defendant to the plaintiff; (2) the breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty.  *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 82 (S.C. 1998)

7.      Under the doctrine of comparative negligence, "a plaintiff in a negligence action may recover damages if his or her negligence is not greater than that of the defendant."  *Nelson v. Concrete Supply Co.*, 399 S.E.2d 783, 784 (S.C. 1991)

### B.  Liability

8.      Prior to trial, the government stipulated to its liability for the accident and the absence of any comparative negligence by Halstead. (ECF 84)  Accordingly, the only issue for this Court to decide is the damages to which Halstead is entitled.

### C.  Damages

9.      Pursuant to 28 U.S.C. § 2675, Halstead is limited to recovering the amount of damages sought in his administrative complaint.  Halstead's initial administrative complaint, filed on July 21, 2017, sought damages in the amount of $1,251,700.62.  On April 10, 2018, Halstead filed an amended administrative complaint increasing the damages sought to $10,001,700.62, and a second

amended administrative complaint was filed on July 1, 2018, increasing the damages sought to $10,001,701.62. The government has not opposed Halstead's amended administrative complaints. Accordingly, Halstead is limited to recovering the amount of damages sought in his second amended administrative complaint, which is $10,001,701.62.

10.     The elements of damage that can properly be considered in determining the amount a plaintiff is entitled to recover include past and future medical expenses, past and future loss of income, loss of family services, pain and suffering, loss of enjoyment of life, mental anguish, and disfigurement. *Boan v. Blackwell*, 541 S.E.2d 242 (S.C. 2001); *Woodberry v. United States*, C/A No. 2:12-1872-DCN, 2015 WL 4395154 (D.S.C. July 16, 2015). "The existence or amount of damages may not be left to conjecture, speculation[,] or guess." *Pearson v. Bridges*, 544 S.E.2d 617, 619 n.5 (S.C. 2001).

11.     A plaintiff in a negligence action is entitled to recover all damages proximately resulting from a defendant's negligent acts, including the aggravation of pre-existing conditions. *Watson v. Wilkinson Trucking Co.*, 136 S.E.2d 286, 291 (S.C. 1964); *Roberson v. United States*, C/A No. 4:09-00491-RBH, 2010 WL 4822325 (D.S.C. Nov. 22, 2010). "Proximate cause is established by proof of actual and legal causation." *Hill v. York County Sheriff's Dep't*, 437 S.E.2d 179, 182 (S.C. Ct. App. 1993). Actual causation is proved by establishing the injury would not have occurred 'but for' the defendant's negligence, while legal causation is proved by establishing foreseeability. *Bramlette v. Charter-Medical-Columbia*, 393 S.E.2d 914, 916 (S.C. 1990). A "defendant may be held liable for anything which appears to have been a natural and probable consequence of [her] negligence." *Id.* "Proximate cause does not mean the sole cause; . . . [t]he defendant's conduct can be a proximate cause if it was at least one of the direct, concurring causes of the injury." *Small v. Pioneer Mach. Inc.*, 494 S.E.2d 835, 843 (S.C. Ct. App. 1997).

12.     "Future damages are only recoverable if they are 'reasonably certain' to occur." *Woodberry* at 4; *Pearson*, 544 S.E.2d at 619.  "A party need not, however, prove future damages in a personal injury case to a mathematical certainty."  *Campbell v. Paschal*, 347 S.E.2d 892, 901 (S.C. Ct. App. 1986).

13.     Halstead was 66 years old at the time of trial. (Tr. 117:23-24)  According to the life expectancy tables found at S.C. Code § 19-1-150, Halstead's projected life expectancy is 16.08 years. (EX. 25)  This code section also provides the Court should consider other evidence of Halstead's health, constitution, and habits in determining his life expectancy.  Having considered the evidence presented in this case, including evidence of remote pre-existing medical conditions, and Halstead's general health and fitness level, the Court finds the life expectancy tables' estimate of Halstead's life expectancy—16.08 years—to be a reasonable estimate, and it will use that figure when determining his future damages.

14.     The Court now considers the amount of damages to which Halstead is entitled.

### 1.  Property Damage/Personal Property

15.     A plaintiff who owns property is entitled to recover actual damages for damaged or destroyed property up to the amount that will restore the plaintiff to the same property status he enjoyed before the loss.  *Nelson v. Coleman Co.*, 155 S.E.2d 917, 921 (S.C. 1967)  At trial, Halstead testified he is claiming $2,862.74 for the value of his C-PAP machine, which he used to treat his sleep apnea, that was never returned to him from the accident scene after the collision. (Tr. 117:3-18)  However, in his second amended administrative complaint, Halstead valued the C-PAP machine at $1,701.62 (Tr. 242:23-243:13), and pursuant to 28 U.S.C. § 2675(b), his recovery for this item cannot exceed this sum.  Accordingly, Halstead's property damage recovery for the value of his C-PAP machine is limited to $1,701.62, and the Court hereby awards him that amount.

### 2. Medical Expenses

16.     "[I]n personal injury actions, the plaintiff may recover for the necessary and reasonable expense caused by the injury such as amounts necessarily paid for medicine, medical attendance, hospital expense and care and nursing." *Sossamon v. Nationwide Mut. Ins. Co.*, 135 S.E.2d 87, 91 (S.C. 1964).  "A plaintiff in a personal injury action seeking damages for the cost of medical services provided to him as a result of a tortfeasor's wrongdoing is entitled to recover the reasonable value of those medical services, not necessarily the amount paid." *Haselden v. Davis*, 579 S.E.2d 293, 295 (S.C. 2003).

### a. Past Medical Expenses

17.     At trial, Halstead presented evidence of past medical expenses related to the accident totaling $193,164.42. (EX. 27; Tr. 113:14-116:16)  This included expenses from the following providers in the following amounts:

| Medical Provider | Total Amount of Bills |
|---|---|
| **Horry Co. Fire & Rescue** | $1,043.00 |
| *Horry County EMS 00008 – 00009* | |
| **Grand Strand Regional Medical Center** | $40,294.67 |
| *Grand Strand RMC 00148 – 00156* | |
| **GSS Trauma General Surgery** | $725.00 |
| *Halstead Admin Documents_00367* | |
| **ACS Primary Care Physicians (Dr. McNabb)** | $572.00 |
| *Halstead Admin Documents_00365* | |
| **Carolina Radiology Associates** | $2,412.00 |
| *Halstead Admin Documents_00369 - 00370* | |
| **Diagnostic Pathology Partnership** | $141.58 |
| *Halsted Admin Documents_00372* | |
| **The Carolinas Emergency Group** | $1,180.00 |
| *Halsted Admin Documents_00374 – 00375* | |
| **Harnett Health** | $59,260.98 |
| *Betsy Johnson Hospital 00269 – 00296, 00315 – 00354* | |
| **Integrated Wound Specialists of NC** | $760.00 |
| *Integrated Wound Specialist 00011 - 00014* | |
| **Dunn Medical Services** | $6,128.88 |

| | |
|---|---|
| *Dunn Medical Services 00259 – 00260, 00379 – 00382* | |
| **A. C. Williams, DDS** | $5,605.00 |
| *A.C. Williams, DDS 00006* | |
| **Cape Fear Valley Harnett Surgical** | $1,420.00 |
| *Harnett Surgical 00008 – 00010* | |
| **Tricare Counseling and Consulting** | $4,062.86 |
| *Tricare Documents_021 – 025, 028, 038, 074 – 076, 079 – 080, 084, 220, 222 – 226, 229, 231 – 234, 237* | |
| **Living Well Behavioral Health** | $3,385.00 |
| *Living Well Behavioral 00001 – 00002, 00024 – 00026, 00077 – 00079* | |
| **Orthopaedic Solutions & Sports Medicine** | $2,298.84 |
| *Ortho Solutions 00026 – 00028, 00030 – 00034, 00056 – 00060* | |
| **Triangle Orthopaedic Associates, P.A.** | $429.38 |
| *Triangle Ortho 00009 – 00011* | |
| **Valley Radiology, PA** | $3,914.00 |
| *Halsted Admin Documents_01081 – 01084* | |
| **VQ Orthocare** | $98.24 |
| *Halsted Admin Documents_01090* | |
| **Duke Neurology** | $4,819.00 |
| *Duke Neurology 00058 – 00060, 00073 – 00074* | |
| **Duke Spine and Pain Management** | $3,374.00 |
| *Duke Spine 00082 – 00084* | |
| **Interventional Pain Center** | $1,200.00 |
| *Tricare Documents_123* | |
| **Family Medical Supply, Inc.** | $51.99 |
| *CPAP Info 00003* | |
| **Prism Medical Products, LLC** | $254.58 |
| *Halsted Admin Documents_01104* | |
| **Rex Hospitals** | $198.00 |
| *Halsted Admin Documents_01087* | |
| **Fayetteville Psychiatric Associates** | $410.00 |
| *Fayetteville Psychiatric 00011* | |
| **Betsy Johnson Hospital** | $12,952.00 |
| *Betsy Johnson Hospital 00269 – 00296, 00315 – 00354* | |
| **Raleigh Orthopaedic** | $4,395.50 |
| *Raleigh Orthopaedic 00034 – 00035, 00134 – 00144* | |
| **Carolina Spine Center** | $4,902.00 |
| *Carolina Spine Center 00027 – 00028, 00041 – 00042, 00046 – 00047* | |
| **Betsy Johnson Physical Therapy** | $2,687.55 |
| *Betsy Johnson PT 00054* | |

| | |
|---|---|
| **Accu Refer Med Lab, LLC** | $1,963.18 |
| *Tricare Documents_177, 197, 235* | |
| **Carolina Regional Radiology** | $379.00 |
| *Tricare Documents_180* | |
| **Wake Radiology Consultants PA** | $333.00 |
| *Tricare Documents_028* | |
| **Salvus Labs, LLC** | $175.00 |
| *Tricare Documents_029* | |
| **Fort Bragg/Womack (Physical Therapy)** | |
| | |
| **Prescription Costs** | $21,338.19 |
| *Tricare Documents_012 - 016* | |
| **TOTAL** | **$193,164.42** |

Additionally, Halstead seeks mileage reimbursement in the amount of $1,980.18 for the numerous trips he made to and from his various providers for accident-related treatment.

18.     At trial, the government challenged only the past medical expenses related to Dr. Boes' treatment of Halstead's left cubital tunnel syndrome in 2019, and Dr. Bai's treatment of Halstead's cervical and lower back pain in 2019 and 2020, as not being related to the accident.   The government based its challenge to these expenses on the fact that Halstead had pre-existing issues with these parts of his body, as shown by his medical records from the 1980's and 1990's while in the Air Force, as well as the fact that both treatments occurred years after the motorcycle accident. Having considered and weighed the relevant evidence, in particular the testimony of Halstead and his treating providers, Dr. Boes and Dr. Bai, and the testimony of the government's experts, Dr. Levin, Dr. Hynes and Dr. Friedman, the Court concludes Halstead's left cubital tunnel syndrome and his cervical and lower back pain were most probably caused by an aggravation of pre-existing conditions as a result of the accident.  Halstead acknowledged having dealt with injuries to these particular parts of his body many years before the accident while in the Air Force, but he testified he was pain free and not limited by these previous injuries at the time of the accident. (Tr. 198:12-

200:1, 247:9-251:2)  Furthermore, Dr. Boes and Dr. Bai, both of whom treated Halstead for the specific injuries in question, related the injuries and resulting treatment to the motorcycle accident. (Boes Depo. (8/14/20) 17:22–18:16, 38:24–39:7; Bai Depo. 18:4-17, 19:15-25)  Although the government's experts opined that Halstead's post-accident cubital tunnel syndrome and post-accident neck and back pain were due to pre-existing conditions unrelated to the accident, none of these witnesses ever saw or treated Halstead as a patient, and each acknowledged the accident was a severe, traumatic event capable of aggravating asymptomatic pre-existing conditions such as those Halstead exhibited.  Furthermore, Dr. Hynes acknowledged there is no imaging study capable of indicating if a patient is experiencing pain, and none of the government's experts could point to any evidence Halstead was experiencing any pain or other problem in his left arm, neck, or back in the months preceding the accident. (Tr. 844:3-7, 848:10-19; Levin Depo 96:12-97:2, 92:15-93:12, 93:13-94:12)  The Court finds this evidence persuasive.  The Court further finds the left ulnar nerve transposition surgery to treat Halstead's cubital tunnel syndrome, and the series of steroid injections to treat Halstead's neck and back pain, were reasonable and necessary under the circumstances.  Accordingly, the Court awards Halstead the full amount of past medical expenses submitted totaling $193,164.42.   The Court further awards Halstead $1,980.18 in associated mileage.

### b.  Future Medical Expenses

19.     Halstead seeks damages in the amount of $459,577 to cover his anticipated future medical costs.  This amount is based upon Moore's life care plan and Bokesch's calculations to account for inflation and present-day value.  "Future damages are only recoverable if they are 'reasonably certain' to occur." *Pearson*, 544 S.E.2d at 619.  "A party need not, however, prove future damages in a personal injury case to a mathematical certainty." *Campbell*, 347 S.E.2d at 901.

20.    The future medical care items included in Moore's plan are as follows:  a physical therapy evaluation once every three years; a one-time occupational therapy evaluation; an acupuncture trial two to three times; physical therapy visits two times a week every three years; occupational therapy visits on an as-needed basis; counseling sessions on an as-needed basis six to twelve times a year for three years, then twice a year for the rest of his life; venipuncture twice a year; a complete metabolic panel (to evaluate medication toxicity) and a basic metabolic panel once year; cervical or lumbar x-rays on an as-needed basis; orthopedic and physiatry office visits once a year; primary care office visits once every six months or on an as-needed basis; psychiatry office visits once every three months; cervical epidural transforaminal steroid injections (particularly at the C4-5 and C6-7 locations) 10 to 15 times over the course of his life; S1 epidural transforaminal steroid injections 10 to 15 times over the course of his life; a TENS unit and related accessories; and a lumbar brace. (EX. 28; Tr. 678:1-684:9, 684:14-685:7, 685:8-686:22, 689:7-691:9)  The specific prescription medications in the plan are Trintellix once a month; Doxepin once a month; Abilify once a month; Naprosyn twice a year; Gabapentin once a month; and Oxycodone twice a year. (EX. 28; Tr. 692:1-693:8; 706:9-18)  Each of these items were supported by Page, Dr. Bai, and Jones, as well as Halstead's own testimony, and although Halstead has no definitive plans to see Dr. Bai in the future, he testified he does anticipate seeing him on an as-needed basis for his chronic lower back and cervical pain, which still bothers him on a consistent basis, moving forward. (EX: 28; Tr. 111:23-113:6, 146:15-23, 98:18-99:9, 99:10-103:20)  Accordingly, the Court finds all of the future treatment items contained in Moore's plan are reasonably certain to occur. The government did not present a life care planning expert at trial; however, it did present testimony from its economist, Yount, that the present value of Halstead's future medical expenses should be

$425,831 as opposed to $459,577. (Tr. 585:22-25; EX. 38)   Having considered and weighed the relevant evidence, the Court awards Halstead $459,577 in future medical expenses.

### 3. Lost Wages / Lost Earning Capacity

21.     Halstead seeks damages for the compensation he lost from Harnett Health following the accident.  "Loss or impairment of earning capacity, consequent to the injuries to the person, is a proper element of compensation." *Matthews v. Porter*, 124 S.E.2d 321, 328 (S.C. 1962).  To award damages for loss of earning capacity, the Court must determine, from the evidence, Halstead's ability to work following the accident. *See Woodberry* at *11.

22.     Initially, Halstead seeks to recover the income he lost for the 108 days he was out of work from September 14, 2015, through January 29, 2016, immediately following the accident. Halstead's annual salary was $60,000 at the time, and he typically worked eight hours a day, Monday through Friday, which equates to a pay rate of $29.49 per hour.  Accordingly, the lost wages sought by Halstead for this time period total $25,479.46. (EX. 22)  Bokesch testified this sum, when adjusted for income taxes, reduces to $22,167. (Tr. 740:10-18; EX. 29)   The government does not challenge this portion of Halstead's lost wage claim; accordingly, the Court awards Halstead $22,167 in lost wages for the work time missed from September 14, 2015, through January 29, 2016.

23.     Halstead also seeks to recover the two years' worth of annual salary and employer retirement plan contribution match he lost by retiring two years earlier than planned due to the difficulties he encountered on the job due to his injuries following the accident.  Until the accident, Halstead intended to work until age 65; however, he retired in August 2018, at age 63, due to the physical and mental difficulties he experienced after returning to work, which rendered him unable to perform at the level he did beforehand. (Tr. 133:17-134:22)  The government challenges this

aspect of Halstead's lost earnings claim on the basis that no doctor or vocational expert deemed Halstead unable to work, coupled with the fact that Halstead did not formally seek any accommodations from his employer to help him manage his workplace struggles. The Court has evaluated the relevant evidence presented on this issue, and the Court finds Halstead has met his burden of proving the injuries from the accident were a proximate cause of his early retirement. In particular, the Court finds persuasive the testimony of Halstead's co-workers, Phillip and Bell, who interacted with Halstead on a daily basis before and after the accident. Phillip and Bell both described Halstead as a hardworking, dependable employee before the accident, but a completely changed person at work afterwards—anxious, often struggling with memory problems, complaining of pain and discomfort in his right hip, and being withdrawn and less patient with the people he worked with. (Phillip Depo. 17:16-20, 16:24-17:8, 18:16-19:2, 19:20-20:11, 37:7-38:1, 48:19-49:10; Bell Depo. 25:21-26:3, 19:23-22:1) Phillip also testified Halstead would attempt to manage his pain at work by standing up periodically, but that did nothing to alleviate his physical discomfort. (Phillip Depo. 37:7-38:1) Bell, who supervised Halstead, described him as "a shadow of the person he was before the accident and even commented on the "haunted look" she noticed on his face once he returned to work. (Bell Depo. 55:6-18) Phillip and Bell also testified they did not think Halstead would have retired early had it not been for the accident. (Phillip Depo. 20:24-21:10; Bell Depo. 56:22-57:2)

24.    According to Bokesch, Halstead's gross earnings over this two-year period would have been $120,000, and his retirement plan contribution was 3% of his annual pay, or $1,800 per year. Hence, the gross earnings sought by Halstead for this two-year period equals $123,600. According to Bokesch, when adjusted for income tax effect, the net lost earnings for this early retirement

totals $108,000.  Accordingly, the Court awards Halstead $108,000 for lost earnings due to his early retirement.

### 4. Loss of Household/Personal Services

25.    Halstead seeks damages for lost household services in the amount of $153,932 based on his limitations around the house following the accident. (Tr. 152:24-153:1)  This sum was calculated by Bokesch based the lost service hours value of 9.9 hours post-accident, which he determined based on information provided to him by Halstead, and an hourly rate of $14.91, which was the applicable hour rate for comparable services in the Fayetteville, North Carolina, area according to data published by the U.S. Bureau of Labor Statistics. (Tr. 737:4-18)  According to Bokesch's testimony, the value of Halstead's pre-trial lost household services is $48,497, and the value of lost future services is $105,435 when calculated out over Halstead's life expectancy of 16.08 years and reduced to present value. (Tr. 738:4-739:3)  Together, the lost household services total $153,932. (Tr. 739:1-3)

26.    Additionally, Halstead presented evidence of paying Bass General Services $4,183 to perform some of the necessary yard work and other maintenance services around his house from 2018-2021. (Tr. 122:13-123:6; EX. 23)  Halstead seeks this sum as damages in addition to the $153,932 calculated by Bokesch.

27.    The government, through its economist Yount, presented evidence that the value of Halstead's lost household services is $140,397. (EX. 38)  Yount relied upon the 9.9 hours of lost weekly service hours as determined by Halstead's economist, Bokesch, for purposes of her calculations, though rather than using the hourly rate of $14.91 utilized by Bokesch, she used an hourly rate value of $10.89 for the Fayetteville, North Carolina, area for the year 2015, which she then adjusted for inflation over the course of a full-function life expectancy rather than utilizing

the full life expectancy of 16 years as provided for by S.C. Code 19-1-150. (Tr. 586:1-17)  Yount explained that some economists use this full-function life expectancy approach to account for the fact that some individuals tend not to be as active in the latter years of life as they age. (Tr. 588:17-25)  At trial, Yount did not identify the source for the $10.89 hourly rate value she used, and she acknowledged that if Halstead were to live beyond his 16-year life expectancy, her calculated value of his lost household services would increase. (Tr. 589:7-590:1)  Accordingly, the Court accepts the value of lost household services as determined by Bokesch and awards Halstead $153,932 for these damages, as well as the $4,183 paid to Bass General Services.

### 5. Pain and Suffering

28.     "An award for pain and suffering compensates the injured person for the physical discomfort and the emotional response to the sensation of pain caused by the injury itself."  *Boan*, 541 S.E.2d at 244.  "Pain and suffering have no market price" and "are not capable of being exactly and accurately determined."  *Edwards v. Lawton*, 136 S.E.2d 708, 710 (S.C. 1964).  "There is no fixed rule or standard whereby damages for them can be measured . . . ," and the amount of damages awarded for pain and suffering is left to the sound discretion of the Court.  *Id*.

29.     According to the evidence presented, Halstead has endured pain and suffering since the day of the accident.  By all accounts, the collision was severe and violent.  Halstead was ejected from his motorcycle, and his body was airborne for a period of time before landing on the roadway. (Tr. 43:5-9; 66:4-8)  Burgess described the collision as an "explosion." (Burgess Depo. 20:18-21:6)  Dr. Levin, one of the government's experts, acknowledged it was a high kinetic, traumatic event, and Dr. Friedman, another of the government's experts, testified Halstead was very fortunate to have survived. (Levin Depo. 92:6-8; Tr. 883:5-10, 884:5-7)  While Halstead's pain improved and resolved in some parts of his body in the months following the accident, it increased

in others, his right thigh and leg, and left neck and upper extremity, in particular. (Tr. 71:10-23, 90:8-13)  Beyond the testimony offered by Halstead himself, his wife, his son Ian, and Burgess, each described how pain has affected and limited Halstead since the accident around the house and in his daily life, and Phillip and Bell described how the resulting pain impacted Halstead in the workplace prior to his retirement in 2018. (Tr. 150:20-151:5, 264:20-266:5, 277:5-279:19; Burgess Depo. 45:19-47:15; Phillip Depo. 18:16-19:19, 48:19-49:10; Bell Depo. 25:21-26:3)  The testimony and other evidence clearly demonstrates that Halstead still continues to experience pain, that it is chronic, and he will most likely continue to experience it in the future in certain parts of his body. (Tr. 150:20-24; 885:8-15; 886:8-10; Levin Depo. 138:12-21; Tr. 854:22-855:6)  Based on this evidence, the Court awards Halstead $1,000,000 for past and future pain and suffering.

### 6.  Loss of Enjoyment of Life and Permanent Impairment

30.     Loss of enjoyment of life "is a compensable element, separate and apart from pain and suffering, of a damages award."  *Boan*, 541 S.E.2d at 244.  These damages are meant to "compensate for the limitations, resulting from the defendant's negligence, on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's inability to pursue his talents, recreational interests, hobbies, or avocations."  *Id*. (footnote omitted).  Similar to pain and suffering, there is no exact measure for loss of enjoyment of life. *Schumacher v. Cooper*, 850 F. Supp. 438, 453 (D.S.C. 1994).

31.     The record is replete with examples of activities Halstead has had to scale back or give up because of the accident.  Halstead is no longer able to engage in many activities he partook in and enjoyed prior to the accident, such as riding his motorcycle, both with his friends and his wife, working out and staying fit, traveling and hiking, and working in the yard. (Tr. 119:15-122:5, 123:13-124:2)  Both Halstead and his wife described how he has become more introverted and

less social, and Halstead testified he gained between 30 and 35 pounds after the accident as result of his sedentary lifestyle. (Tr. 266:8-14, 53:3-7)   Both also testified their intimacy has been adversely affected by the accident. (Tr. 125:2-9; 268:8-19)   Based on this evidence, the Court awards Halstead $1,000,000 for past and future loss of enjoyment of life.

### 7.  Mental Anguish

32.      "Separate damages are given for mental anguish where the evidence shows, for example, that the injured person suffered shock, fright, emotional upset, and/or humiliation as the result of the defendant's negligence." *Boan*, 541 S.E.2d at 244.

33.      The record is also replete with examples of the mental anguish Halstead has experienced since the motorcycle accident.  The accident, as described previously, was severe.  Tragically, it took the life of Halstead's friend, Jackson. (Tr. 45:17-46:9)  As for Halstead, beyond his physical injuries, he suffered a traumatic brain injury, which led to difficulties with his memory. (Romano Depo. 82:11-83:17; Levin Depo. 111:3-7)  He has experienced nightmares and flashbacks of the accident and has been diagnosed with PTSD, anxiety, and depression. (Jones Depo. 14:15-20, 19:10-18, 24:15-27:21, 70:9-71:14, 73:21-75:4)  He described being humiliated at work when he would lose his train of thought and "go blank" while giving presentations to physicians, and Bell characterized Halstead as "scatterbrained" following the accident. (Tr. 91:25-92:15; Bell Depo. 19:23-22:21, 55:6-18)  She even characterized Halstead as having a "haunted look" on his face at times. (Bell Depo. 55:6-18)  Phillip explained how Halstead was not the same person after the accident, tending to be "short" with people and withdrawn at work. (Phillip Depo. 16:14-23, 17:16-20)  Mrs. Halstead explained how her husband had a sadness about him after the accident and was depressed and no longer felt good about himself. (Tr. 270:5-272:4)  Ian explained how his father was a changed person after the accident, and he described the toll the collision took on his father

both mentally and physically. (Tr. 278:11-19)  Burgess also talked about the toll the crash took on Halstead, describing him as having a "doom and gloom" outlook on life afterwards. (Burgess Depo. 45:19-46:22, 48:5-49:2).  Dr. Raley, who performed a psychiatric evaluation on Halstead post-accident, explained how Halstead experienced flashbacks, nightmares, intrusive thoughts, excessive guilt, depressed mood and anxiety, irritability, hypervigilance with feelings of having a lack of safety, worsened concentration, and impaired sleep as a result of the mental and emotional impact from the accident. (Tr. 613:17-614:14)  Based on this evidence, the Court awards $1,000,000 for Halstead's past and future mental anguish.

**8.  Disfigurement**

34.    Halstead is entitled to a reasonable sum to compensate for his disfigurement. *Schumacher*, 850 F. Supp. at 453.  Halstead has scarring on his upper lip and chin, right shoulder, right hand, left elbow and hip as a result of the accident.  (Tr.  63:20-64:8, 66:21-67:7, 129:16-22; Boes Depo. (8/14/20) 16:7-11; EX. 26)  Based on the evidence presented, the Court awards Halstead $10,000 for disfigurement.

### III.    CONCLUSION

Based on the foregoing, the Court FINDS AND CONCLUDES that the government is liable to Halstead in the total amount of $3,954,705.22.  This total is comprised of $1,701.62 for property damage, $193,164.42 for past medical expenses, $1,980.18 for mileage incurred for medical visits, $459,577 for future medical expenses, $22,167 for lost wages for the work time missed from September 14, 2015, through January 29, 2016, $108,000 for lost earnings due to his early retirement, $153,932 for lost household services, $4,183 for money paid to Bass General Services, $1,000,000 for pain and suffering, $1,000,000 for loss of enjoyment of life and permanent impairment, $1,000,000 for mental anguish, and $10,000 for disfigurement.

**IT IS SO ORDERED.**

Signed this 17th day of March 2022, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE